## TINKER v. KIER et al., Appellants.

### Division Two, March 29, 1906.

1. **CANCELLATION OF CONTRACT: False Representations: Necessary Proof.** To obtain a decree cancelling and rescinding a contract for the sale of the stock of a corporation and to compel a refunding of money paid for the stock, on the ground of false and fraudulent representations made by the seller, the purchaser must establish, to the satisfaction of the chancellor, that the representations were false, that they were in reference to material facts connected with the sale, and that the purchaser relied upon them and was thereby induced to enter into the contract and was injured thereby. And in this case plaintiff's evidence, though sharply contradicted by defendants, meets that requirement.

2. ————: ————: **Reliance.** The purchaser of stock of a corporation, entirely without experience in the business it was designed to inaugurate, has the right to rely upon the representations of the incorporators.

Tinker v. Kier.

3. ———: ———: **Corporation: Free From Debt: Antecedent Mortgage.** A representation by the promoters and incorporators of a company that it was free from debt will be held to mean that the land which was its entire assets was free from debt, although the mortgage thereon had been made by the person from whom the company bought the land.

4. ———: ———: ———: ———: **Purchase of Stock.** Defendants, promoters and incorporators of a company which had, through a "straw" man, purchased some undeveloped mining land, on which was already a mortgage for over $100,000, its entire purchase price, except the $5,000 paid for the option, represented to the plaintiff that the company only owed $8,000, and that the purpose of selling the stock, which they represented to be treasury stock, was to raise money with which to pay that debt. He bought stock of the face value of $25,000 for $8,000, and they did not turn the money into the treasury, but divided it equally among themselves, and turned over to plaintiff stock which had been issued to them in payment for their services and expenses in promoting the company and buying an option on the land. At that time the company did not have a dollar in its treasury, and its entire assets was the equity of redemption in the land, the mortgage on which was foreclosed when the debt became due. *Held*, that these representations and facts authorize a cancellation of the contract of sale and a judgment for plaintiff for the money he paid for the stock.

5. ———: **Weight of Evidence: Number of Witnesses.** There is no rule of law which makes the greater number of witnesses testifying to certain facts the test for determining upon which side of the controversy the evidence preponderates.

6. ———: **Equity: Deference to Chancellor.** It is the duty of the appellate court to carefully weigh and fully review all the evidence developed at the trial of an equity cause, for the purpose of ascertaining whether the decree and findings were in harmony with good conscience and the well-settled principles of equity jurisprudence. But that does not mean that it will not defer somewhat to the findings of the chancellor. Where there is a conflict in the evidence, it will accord a proper deference to his findings, especially where the testimony is oral and the witnesses were before him.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood*, Judge.

AFFIRMED.

*Johnson, Allen & Richards* and *Henry W. Allen* for appellants.

(1)  In actions to set aside contracts or conveyances on the ground of fraudulent misrepresentations, it must affirmatively appear by the clearest evidence that the representations were false; that the misrepresentations were as to material facts; and that plaintiff was induced by such representations to enter into the contract, or make the conveyance, and was thereby injured.  These facts were not established in this case. Smith v. Dye, 15 Mo. App. 585, affirmed, 88 Mo. 581; Bryan v. Hitchcock, 43 Mo. 527; Wannell v. Kem, 57 Mo. 478; Bailey v. Smock, 61 Mo. 213; Powell v. Adams, 98 Mo. 598; Lewis v. Land Co., 124 Mo. 672; Warren v. Ritchie, 128 Mo. 311; Brownlee v. Hewitt, 1 Mo. App. 360; Franklin v. Holte, 7 Mo. App. 241; Levering v. Schnell, 8 Mo. App. 589.  (2)  This being an action in equity, the appellate court should examine all the evidence and is at liberty to determine for itself the weight of the evidence and the credibility of the witnesses.  Courtney v. Blackwell, 150 Mo. 245; Dalrymple v. Craig, 149 Mo. 345; Sheridan v. Nation, 159 Mo. 27; Robertson v. Shepherd, 165 Mo. 360; Bank v. Slattery, 166 Mo. 620.

*Holmes, Blair & Koerner* for respondent.

While it is true, in one sense, that the case is to be tried here *de novo,* still it does not stand on the same basis that it would were it being tried here for the first time.  It is the settled rule of this court, as of all appellate courts, to allow great weight to the finding of facts of the court below.  Carter v. Dilley, 167 Mo. 564; Dunivan v. Dunivan, 157 Mo. 157; Chance v. Jennings, 159 Mo. 544; Culver v. Smith, 82 Mo. App. 390; Berry v. Hartzel, 91 Mo. 138; Springer v. Kleinsorge, 83 Mo. 159; Mathias v. O'Neil, 94 Mo.

520.    The reasons upon which the rule rests apply with great force to this case. The evidence, other than the documentary evidence, was entirely oral. The cause was tried before a judge of great ability and experience, who sat within six feet of these "evading" promoters while they told their Munchausen tale on the witness stand. He was in a position to accurately determine what weight should be given to their testimony, and we feel confident that there is nothing in the record which will incline this court to reverse the conclusions reached by him.

FOX, J.—This cause is here upon appeal from a judgment and decree rendered in the circuit court of the city of St. Louis. The cause of action upon which this decree and judgment rests is thus stated in the petition:

"Plaintiff, for cause of action, by attorney states that heretofore, to-wit, on or about the 5th day of June, 1901, the defendants, being the owners of twenty-five hundred shares of the capital stock of the Kier Lead Company, a corporation organized under the laws of the State of Missouri, desired to sell the same to plaintiff for the sum of eight thousand dollars. That in order to induce and persuade plaintiff to purchase the same, they represented to plaintiff that said Kier Lead Company had a capital stock of seven hundred and fifty thousand dollars, divided into seventy-five thousand shares of the par value of ten dollars each, and that said stock was fully paid up and non-assessable. That the said company had a tract of land in the county of St. Francois, and State of Missouri, of great value. That the company had no indebtedness save some inconsiderable debts owing to a few persons, amounting, in the aggregate, to less than eight thousand dollars, and that it was for the purpose of paying off and discharging such indebtedness that they desired to sell said shares of stock. The defendants further stated to

plaintiff that they themselves had invested in the company more than seventy thousand dollars, twenty thousand dollars of which had been expended in boring said land in St. Francois county.

"Plaintiff further states that believing the said representations and statements to be true, and being influenced thereby, he did, on said 5th day of June, 1901, purchase from the said defendants, the said twenty-five hundred shares of stock, being certificates No. 120 for 1,000 shares; No. 121 for 1,000 shares, and No. 122 for 500 shares, paying them, the said defendants, therefor the sum of eight thousand dollars, which sum was paid in the following manner; two thousand dollars in cash on said 5th day of June, 1901, and six thousand dollars in the shape of a draft or acceptance for said amount dated June 5, 1901, at four months, drawn by the defendant, Henry L. Whitman, on plaintiff and by plaintiff accepted.

Plaintiff further states that each and every of the said representations and statements made by defendants to plaintiff as aforesaid was false, and was known by defendants to be false at the time the same was made, and that said false representations and statements were willfully made by defendants for the purpose of deceiving, misleading, cheating and defrauding plaintiff.

"That said Kier Lead Company's stock was not fully paid up and but a trifling amount had been paid thereon. That its property in St. Francois county had a speculative and unsubstantial value only, and was subject to a deed of trust made to secure the payment of one hundred thousand dollars, being almost the entire purchase price thereof. That the company had no assets save the equity of redemption in said St. Francois county land. That the defendants had not invested seventy thousand dollars in said company, but had invested only twelve hundred and fifty dollars each, and had never expended a dollar in boring said land. That

defendants did not desire the said eight thousand dollars for the purpose of paying debts of the company, but for their own private use, and plaintiff avers that they did apply the cash and the proceeds of said draft for six thousand dollars, which they discounted, to their own private uses.

"Plaintiff further states that upon the maturity of the said draft he refused to pay the same, and it was duly protested for non-payment, and has since been taken up and is now held by defendants.

"Wherefore, and on account of the premises, plaintiff herewith tenders defendants said twenty-five hundred shares of stock and prays for a decree of this honorable court rescinding the said sale, ordering and requiring defendants to pay back to plaintiff said sum of two thousand dollars with interest thereon from June 5, 1901, ordering and directing defendants to surrender said draft or acceptance to plaintiff for cancellation, and enjoining and restraining them from negotiating or otherwise disposing of the same, and for such other and further relief as to the court may seem just and proper."

The answer to this petition in substance avers that plaintiff purchased this stock on May 3, 1901, paying for it on June 5, 1901, as alleged in the petition; that the 2,500 shares of stock stood on the books of the company in defendant's names, and that they were authorized to sell and did sell them for themselves and as agents or trustees of William H. Miltenberger, all of which plaintiff well knew. Further answering defendants deny the other allegations of plaintiff's petition generally, and in addition set up a counterclaim for the amount of the draft, $6,000, which they were obliged to take up at maturity, and $240 statutory damages because of its non-payment.

The reply denies the allegations of the answer *in extenso*, and repeats the allegations of the petition.

The evidence introduced by plaintiff was substantially as follows:

In December, 1900, Jacob Day was and for many years had been the owner of a certain tract of land in St. Francois county, Missouri, known as the "Day farm," and containing three hundred and fifty-eight acres. It was situated in the lead district of St. Francois county; was of small value for agricultural purposes, but of considerable value for lead mining purposes, if the fact that it contained lead in quantities justifying mining operations could be satisfactorily established. From time to time various parties, some three or four in number, had secured options on the land, and had bored or drilled it with diamond drills. The result, in each and every case, was that each of the parties abandoned his option and contented himself with the loss of the money paid for the option and expenses in boring or drilling. During that year Wm. H. Miltenberger and Wm. C. Doak, two promoters, learning of the situation, secured an option on the land, paying so much a month therefor, and later decided to take a deed for the land, give a deed of trust back for the unpaid purchase money, form a corporation with a large capital stock, convey to it their ownership in the land and then sell stock. In order to raise the amount of cash required to make a payment on this land, and not desiring their names to be used in connection with it, it was necessary to associate others with them. The men selected for the purpose were the defendants in this case, Dr. Kier, a practicing physician of the city of St. Louis, and Mr. Whitman, the secretary of an agricultural machine manufacturing company. The plan agreed upon and carried out by these four people was as follows: They were to contribute $1,250 each and thus raise the $5,000 required for the cash payment. The $5,000 was to be paid to Jake Day, a deed for the land was to be taken in the name of W. S. Browning, and Browning was to execute

notes to Day and a deed of trust securing them for the remaining $104,800 of the purchase price. Browning was then to convey the land to the defendants, Kier and Whitman, who in turn were to convey it to a corporation to be organized with a capital stock of seventy-five thousand shares, of the par value of ten dollars each, in full payment for such shares. Of these seventy-five thousand shares fifty thousand were to belong to the four promoters organizing the corporation, twelve thousand five hundred to each. Twenty-two thousand five hundred shares were to be set aside, they said, for the purpose of raising a fund for sinking and equipping a shaft and constructing a plant (estimated to cost about $200,000) and paying off the $104,800 mortgage. The remaining twenty-five hundred shares were to be sold and the proceeds distributed between the four promoters to reimburse them for their outlay of $5,000 and such incidental expenses as they might incur in the way of office rent, printer's bills, corporation fees, etc. On December 21, 1900, Day deeded the land to W. S. Browning, receiving $5,000 in cash and a mortgage for $104,800. The $5,000 was furnished to Browning by Whitman, and was contributed in equal portions by Kier, Doak, Miltenberger and himself. Browning on the same day deeded the property to Whitman and Kier, subject to the Day deed of trust, and an additional deed of trust held by Doak for $5,000. The corporation was formed by Kier and Whitman and F. A. Wind, as incorporators. All of the stock was subscribed, save ten shares, by Kier and Whitman. The remaining ten shares were subscribed by Mr. Wind. The certificate of incorporation of the company (The Kier Lead Company), having been duly issued, Kier and Whitman, on January 17, 1901, conveyed to it the Day land. Whitman was made president and treasurer of the company and Dr. Kier was elected secretary.

Several months after the company was organized the respondent, Z. W. Tinker, a wealthy man, engaged

in many large enterprises, was introduced to Miltenberger by the secretary of the Columbia Brewery Company. Miltenberger talked to him about the property and about what an advantageous place was there afforded for a beer depot. Respondent made inquiry of Miltenberger as to who were interested in the property and on being informed that Dr. Kier was an interested party remarked: "Well, Dr. Kier is a good friend of mine, anything Dr. Keir says goes with me." Miltenberger succeeded in inducing him to take a trip to the land with him, at what date it is not quite clear, but probably May 1 or 2, 1901. At the Union Station, Mr. Whitman joined them, was introduced to Tinker by Miltenberger, and accompanied them on their trip. They visited the land, dined at Jake Day's house, and the drill holes and cores were shown to Tinker. Respondent testified that he knew nothing whatever about lead mines or mining; that nothing, however, was said to him about who had bored the holes or about the condition of the title; that the trip was taken for the purpose of making a physical inspection of the land. Upon their return to St. Louis the three went to Faust's for supper, and Miltenberger and Whitman telephoned Dr. Kier to meet them. When the four, Kier, Whitman, Miltenberger and Tinker, met at Faust's, the subject of the sale of 2,500 shares was broached. Tinker testified that while they were sitting at the table Dr. Kier remarked, "Tinker, I am very glad that we have an opportunity of getting you into this lead business with us. I want you to become interested and I want you to be the president of the company; you know lots of people and I think we can make this thing go." He stated that he had every confidence in Dr. Kier; that he seemed to be the head of the company; that the others were strangers to him. That the first proposition made to him was to sell him 2,500 shares of stock at four dollars a share and then they said they would make it eight thousand dollars for

the 2,500 shares; that these propositions were made by Dr. Kier and Whitman; that they told him it was treasury stock; that neither Kier nor Whitman informed him that Miltenberger had any interest in the 2,500 shares, and that it was a very valuable lead proposition; that the company was capitalized for seven hundred and fifty thousand dollars and that they expected the stock to shortly be worth par. In reply to some inquiries as to the indebtedness of the company he was told that the company had no indebtedness, save about eight thousand dollars, and that the proceeds of the 2,500 shares, which they were offering to him for $8,000, were to be applied to the payment of that indebtedness, would pay it in full, and the company would then be entirely free from debt. He was also informed that by an agreement between the originators of the scheme they had set aside 50,000 of the 75,000 shares for themselves, the remainder for the treasury. In response to an inquiry on his part as to what they had in it, they assured him that it had cost them upwards of $70,000. On his expressing surprise at the amount, they explained that they had spent more than $20,000 in drilling the land; that although the company had no capital for its development, its tract of land was of very great value; that it had been thoroughly drilled, and had been examined by experts and that the existence of lead in vast quantities had been proved and established. That relying upon the truthfulness of these representations, coming as they did from Dr. Kier, or from others of the four in his presence, and with his sanction, he felt inclined to buy the stock. He was told that Mr. B. B. Graham had agreed to take the stock at $10,000, but they thought they could "square things" with him, and preferred on account of respondent's large acquaintance to have him in the company. He told them that he would give them his decision later on. Shortly thereafter, possibly the next day, at the solicitation of Whit-

man, Tinker gave to Whitman the following memorandum:                "Columbia Brewing Company,

"St. Louis, Missouri, May 3, 1901.
"Mr. Wm. H. Miltenberger, City:

"Dear Sir:—I will take the 2,500 shares stock in the Kier Lead Company spoken of by Mr. Whitman, for eight thousand dollars. Will call on you in regard to same upon my return from New York.

"Sincerely,

"Z. W. TINKER."

Respondent testified that this memorandum was written at the request of Mr. Whitman, the latter even writing the memorandum in pencil and handing to him to copy, which he did.

In company with Miltenberger respondent visted Dr. Kier at his home on Lindell avenue; that Mr. Wihtman was present at this meeting. At this meeting matters generally were discussed and a proposition was made to him to elect a new board of directors. That a second visit was made to Dr. Kier's house, at which time Mr. Miltenberger and Mr. Tate, the manager of the Columbia Theater, were present. On this visit Mr. Tate and Dr. Kier had quite a conversation as to the amount of capital they had invested in this property, and that he heard Dr. Kier tell Mr. Tate that they had upwards of $70,000 in money in the property. That a proposition was made to him to sink and equip a shaft on this property for ten thousand shares of stock. As to when this proposition was made it is not clear from the testimony, but that it was after the letter of May 3rd. That as the shaft would cost about forty thousand dollars the question required some consideration on his part. At the various interviews had upon the subject it was urged upon the respondent that the stock would go to par as soon as the shaft was in lead. Negotiations still pending, the four promoters had their attorney, Mr. Wind, put the matter in the form of a written con-

tract. This contract was exhibited to Mr. Holmes, counsel for Mr. Tinker, May 21st, and was pronounced unsatisfactory. Changes were made in it but it was not signed by Tinker, he concluding that before he signed a contract for such an amount concerning a subject-matter of which he knew nothing, he would at his own expense employ an expert to examine the matter and report whether the exploration was sufficiently complete to warrant the sinking of the shaft, and what such sinking would cost. He employed Mr. Wheeler, who made a report dated June 3rd; when it was delivered to Tinker, or read by him, does not appear. This report put at rest the sinking of a shaft until further drilling should be done.

In the meantime, May 25th, Tinker purchased from Miltenberger and Browning 4,500 shares at two dollars per share. On the 5th of June Whitman tendered the 2,500 shares referred to in the talk at Faust's and in Tinker's letter of May 3rd, and Tinker having at that time no suspicion of the real state of affairs, accepted them, paying two thousand dollars in cash and six thousand dollars in a four months' acceptance, drawn on him by Whitman. The two thousand dollars was in the shape of a check, to the order of Whitman, at his request, he stating that the company had no bank account and that he was the president and attended to the company's finances. No part of the $8,000 was used to pay the debts of the company, but the whole was divided amongst the four promoters.

Thus matters rested until sometime in the latter part of August or the fore part of September, when Miltenberger, having quarreled with his associates, met Mr. Tate at the Columbia Theater. What their conversation was does not appear verbatim, but Tate learned and promptly advised Tinker of the real facts in the case. Tinker then learned for the first time that the matters had been misrepresented to him by the four promoters, and that at the time they came to him they

had invested in the property $5,000, not $70,000, and they owed $104,800 instead of $8,000. That this money had not paid the company's debts, but had been divided amongst the promoters, and that the stock was without value of any sort and never had any value. He ascertained that the acceptance had been discounted at the Boatmen's Bank; he notified the bank not to pay it, and in September made a tender of the 2,500 shares of stock to the defendants. On the maturity of the note it was protested and taken up by the defendants Kier and Whitman, and on February 3, 1902, the deed of trust was foreclosed under the Day deed of trust.

Mr. Tate testified that he was the manager of the Columbia Theater, and that Mr. Tinker being one of the principal stockholders in that company he was on close confidential business relations with him. He details an account of a trip he made to the lead district of St. Francois county in company with Mr. Tinker and Mr. Miltenberger, sometime in the latter part of April; that this trip was made by Mr. Tinker for the purpose of visting the agents of his brewing company, and to see the Day land. That during the month of May and about ten days after this trip to the lead district, at the request of Mr. Tinker he accompanied him on a visit to Dr. Kier's house; that respondent suggested to him that he get as much information as he possibly could on this visit. That those present at this meeting were Kier, Miltenberger, Tinker and himself. That Dr. Kier was delighted to have Mr. Tinker join him in the enterprise and that during the conversation and in the presence of Tinker and Miltenberger he asked Dr. Kier how much money he had in the enterprise, to which the doctor replied: "Why we have got upwards of $70,000; I have just put money in it, been bothered with it, been up to the Boatmen's Bank and fixed it with old man Lackland to supply the money, have just been sinking money in it ever since I have had it. Now I want to get somebody in it that has got some money, and put it on

a strong basis.'' Mr. Tate testified that no statement was made as to any indebtedness of the company and that after leaving there Mr. Tinker laid great stress on the fact that the other gentlemen had money invested in it with him and that made him determined to go ahead. This witness states that he received his information as to the existence of the one hundred thousand dollar deed of trust from Miltenberger; that it was at the time the Columbia Theater first opened and that they opened the 18th of August of that year, and that he at once informed Mr. Tinker.

We have carefully read in detail the evidence of the defendants as disclosed by the record; it can serve no good purpose to give the details of their testimony, but it will suffice to state that their testimony tended substantially to show that Tinker was, prior to his purchase of the 2,500 shares, fully informed by them of the fact that they had paid but $5,000 on the land; that there was a deed of trust on the land for $104,800; that the drilling which had been done on the land was done by prior companies; also that the proceeds of the 2,500 shares were to be divided amongst the four promoters to reimburse them for the $5,000 they had paid on the land, and about $2,000 which they had expended in office rent and miscellaneous expenses. They denied that they had represented to him that they had invested $70,000 in the property, $20,000 of which had been spent in drilling the land.

As to what was paid for the property and the existence of the Day deed of trust, Dr. Kier testified that either at the meeting at Faust's or very shortly thereafter at the next meeting, four or five days afterwards, Tinker was told that only $5,000 had been paid for the property and that there was a mortgage of $104,800 on the property. Whitman testified that respondent asked him one time what they had in the property and that he evaded the question. He testified that he thinks he told Tinker about the existence of the Day deed of trust

on the train going down to visit the land, but is sure that he told him at Dr. Kier's house. Miltenberger testified that Tinker was told of the existence of the deed of trust while on the land. This statement is contradicted by Day, testifying on behalf of the defendants. Miltenberger further testified that he next spoke of the deed of trust to Tinker at Dr. Kier's house and next at Mr. Wind's office when the contract for sinking a shaft was being prepared. He also testified that at the Faust meeting it was stated to Mr. Tinker that the Standard Lead Company had spent ten to thirty thouand dollars in drilling the land and that Mr. Day in his presence told the respondent when they visited the land that one of the holes on this land had been drilled by the Doe Run Company and another by the Standard. This statement is also denied by Day. Whitman also testified that Mr. Day stated that the drilling had been done by the Doe Run and Standard Lead companies. Dr. Kier stated that Whitman in offering the stock to Tinker stated that it was owned by the four promoters. Miltenberger, testifying in answer to the question, "What, if anything, was said to Mr. Tinker in regard to who the owners of the 2,500 shares were?" said: "I don't know whether we told Mr. Tinker that there were any owners. I considered that the stock belonged to the Kier Lead Company; that it belonged to ourselves; I don't remember that I said it belonged to anybody except that it was company stock. Q. Was there anything said in your presence about it belonging to the promoters, or the proceeds of the sale being divided among the promoters? A. Not that I know of."

Mr. Tinker was recalled in rebuttal and repeated practically the former testimony; he denied the statments of the other witnesses in relation to his knowledge of the existence of the hundred thousand dollar deed of trust and stated that he did not hear of it prior to August, 1901.

This is a sufficient indication of the facts in this

case. We will give them such consideration as they may demand during the course of the opinion.

At the close of the testimony the cause was submitted to the court and the following decree and judgment was rendered:

"Now at this day come the parties, plaintiff and defendants by their attorneys, and the cause having been submitted, the court being fully advised in the premises, doth find the issues therein joined in favor of the plaintiff. And the court doth order, adjudge and decree that the contract between plaintiff and defendants set forth in the petition, for the purchase of twenty-five hundred shares of stock (being certificate No. 120, for one thousand shares, certificate No. 121 for one thousand shares and certificate No. 122 for five hundred shares) of the Kier Lead Company, be and the same is hereby rescinded, cancelled and for naught held.

"The court doth further order, adjudge and decree that the bill of exchange mentioned in said petition and given defendants by plaintiff under said contract in part payment for said shares of stock, said bill of exchange being dated at St. Louis, Missouri, June 5, 1901, drawn by the defendant Henry L. Whitman, directed to plaintiff by and under the name of Z. W. Tinker at the said city of St. Louis, requesting the said Tinker to pay to the order of said Whitman four months after the date of said bill of exchange the sum of six thousand dollars, which bill of exchange was on the day of the date thereof accepted in writing by plaintiff under the said name of Z. W. Tinker, and was thereafter indorsed by the defendant William F. Kier, and which bill of exchange was filed in this cause as an exhibit to the answer of the defendants herein, be and the same is hereby cancelled and adjudged to be null and void and of no force and effect, and defendants are required and ordered to surrender and deliver the same to plaintiff.

"The court doth further order, adjudge and de-

cree that plaintiff have and recover from the defend-
ants, jointly and severally, the sum of two thousand
dollars paid them by him on June 5, 1901, in part pay-
ment for said shares of stock, together with interest
thereon, amounting in the aggregate to the sum of two
thousand two hundred and twenty dollars, and that he
have execution therefor.

"The court doth further find the issues on the coun-
terclaim filed by defendants in favor of plaintiff. The
court doth further order that the defendants William
F. Kier and Henry L. Whitman pay the costs of the
action, and that plaintiff recover his costs from said
defendants and have execution therefor."

Motions for new trial and in arrest of judgment
were timely filed and by the court taken up and over-
ruled. From the judgment and decree rendered in this
cause the defendants prosecute this appeal and the re-
cord is now before us for consideration.

OPINION.

The record in this cause presents but one proposi-
tion for consideration, that is as to the sufficiency of the
evidence to support the decree and judgment rendered
by the trial court.

This is an action to cancel and rescind a sale of
stock in the Kier Lead Company and to compel the
refunding of money paid for the same, on the ground
of certain false and fraudulent representations, which
are fully set out in the petition. There is no dispute as
to the law upon the subject involved in this controversy.
That plaintiff must establish to the satisfaction of the
chancellor that the representations made by defendants
were false, that such representations were in respect
to material facts in this transaction and that plain-
tiff relied upon such representations and was there-
by induced to enter into the contract and was thereby

injured, is clear, and is not controverted by counsel for respondent.

We are simply confronted in this record with a pure question of fact; in other words, is the evidence disclosed by the record sufficient to support the judgment and decree of the trial court? That the testimony in this cause is in conflict is plainly disclosed by the record.

We have carefully read in detail all the testimony in this cause and if the testimony of the respondent, corroborated as it is in some material particulars by witness Tate, was believed by the trial court, it affords ample support upon which the decree and judgment must rest. At the very inception of the consideration of this controversy we find the respondent without experience in the business enterprise sought to be inaugurated by the promoters, in other words, a stranger to the business in which the corporation was about to engage; he, therefore, had the right to rely upon the representations of the defendants, who were the promoters of the enterprise. [Hess v. Draffen & Co., 99 Mo. App. 580, and cases cited.]

Plaintiff clearly testified as to the representations made by defendants, as well as his reliance upon them, which induced him to purchase the stock in the corporation. Doubtless the trial court felt that the reasonable probability of the truth of the testimony of the plaintiff and witness Tate was emphasized by the disclosures of the true nature and character of the enterprise sought to be inaugurated, as it appears from the record in this cause; for it is nearly impossible to conceive how any man possessed of the slightest business intelligence would have purchased the stock in the Kier Lead Company had all the facts been disclosed to him as contended by appellants. Plaintiff testifies that defendants represented that this corporation was free from debt, except about eight thousand dollars, and that his purchase

money for the stock would be used for the purpose of settling that indebtedness.

This corporation did not have a dollar in its treasury and its only assets was a mere shadow, consisting of an equity of redemption in the St. Francois county land, upon which there was a deed of trust for over one hundred thousand dollars. However, it is earnestly contended by learned counsel for appellants that this incumbrance upon the land was not a debt of the corporation, but simply a debt by Browning who executed the notes and deed of trust for the balance of the purchase money. While it may be true that this corporation was not liable for this indebtedness, evidenced by the Browning note, it is equally true that this land was the basis and foundation of the corporation, and if the corporation was formed for any purpose other than to get some one to buy stock, it was for the purpose of mining operations upon this land, and unless the promoters expected to assume this indebtedness and hold this land as their capital stock, then we confess that the whole transaction must be treated as the basest fraud upon the public or individuals who might deal with it. The entire talk with respondent related to this valuable lead land, which was understood to be the entire asset of the corporation, and if appellants represented to respondent that this corporation was free of debt, a court of equity would be of dull conscience that would not treat such representations as it would naturally be understood by the party to whom the representations were made. It would be folly to say that representations were made that a corporation was entirely solvent and not indebted, when as a matter of fact its entire assets were covered by a deed of trust for over one hundred thousand dollars. A representation that a corporation is free of debt must be treated as it would ordinarily be regarded, that the body or assets of the corporation was not encumbered.

The same conflict of evidence is disclosed as to

other allegations of false and fraudulent representations charged to have been made by appellants. The witnesses testifying in this cause upon the most vital questions were all more or less connected in some way with the transaction. It is true the witnesses on the part of the appellants out-number those for the respondent. The record discloses and it is practically conceded that all the promoters of this new enterprise were very much interested in inducing respondent to become a stockholder in the corporation. However, there is no rule of law which makes the greater number of witnesses in a cause, testifying to a given state of facts, the only test of determining upon which side of the controversy the evidence preponderates or the weight of evidence rests. This is an action in a court of equity and under the uniform rules of this court it is the duty of the appellate tribunal to carefully and fully review all the testimony developed at the trial of the cause, to the end that it may be ascertained whether or not the finding and decree of the court are in harmony with good conscience and the well-settled rules of equitable jurisprudence applicable to the proceeding in hand. While this is true, it does not mean that we are to pay no deference whatever to the finding of facts of the trial court, and while this court will carefully examine the facts in equity cases, and render a judgment for the right party, notwithstanding the finding of the trial court, it has been the uniform expression of this court that proper deference should always be accorded to such findings, and while such deference and regard for the conclusions of the trial court should not lessen the strictness or carefulness in the consideration of the facts disclosed by the record, yet it is highly important, especially where the witnesses were present in that court and testified orally, to fully and carefully consider the conclusions reached based upon the testimony of such witnesses.

In Carter v. Dilley, 167 Mo. l. c. 571, this court in

discussing a record in which there was apparently a conflict of evidence similar to the case at bar, in speaking of the weight to be attached to testimony, said: "Except one deposition, the evidence was all oral. Its weight depended largely on the character, experience, fairness and intelligence of the witnesses. It was patiently heard by an experienced and judicious chancellor. He was in a much more favorable position to wisely determine its preponderance than we are. After a careful reading and consideration of this evidence, we cannot say that he did not determine that preponderance correctly. Hence, deferring to his opinion under such circumstances, as we are accustomed to do, we think his judgment on this issue ought also to be sustained."

To the same effect was Dunivan v. Dunivan, 157 Mo. l. c. 160. It was said by this court in that case: "Appellant urges this court to review the testimony and reverse the finding of fact by the trial court as to the notice of and participation in the fraud by defendant Milner, and to enter a decree here in his favor. This court will examine the facts in equity cases and render a judgment for the right party, notwithstanding the finding of the trial court. But proper deference is always accorded the finding of the trial court, especially where witnesses were present in that court and testified orally, and its conclusions and findings will not be lightly treated nor arbitrarily disturbed. It is only where the result is manifestly wrong that this court will set aside the finding of facts of the trial court, in equity cases."

We see no necessity for pursuing this subject further. Turning to whatever page of the record disclosing the testimony in this cause you may see fit and we are confronted with the same conflict in the evidence by all these parties, all of whom, as heretofore stated, have some interest in this controversy. All of these witnesses were present and testified orally before the trial judge, who during his occupancy of the circuit bench

was recognized by the bench and bar as an able, careful and painstaking judicial officer. He had opportunities to judge of the credibility of the witnesses before him and of the weight to be attached to their testimony that are not afforded the appellate court; hence it would be a dangerous precedent for this court, unless the record discloses that the result of his findings were manifestly wrong, to undertake under such circumstances to disturb his finding and conclusions based upon the testimony of witnesses who were personally present in court before him. We know not who the witnesses are; have none of the opportunities afforded us of applying the tests of their credibility, and to reverse this decree and judgment rendered by a careful and experienced chancellor would be merely guesswork, and could only be predicated upon the theory that more witnesses testified for the appellants than did for the respondent, and this we are unwilling to do.

We have carefully reviewed the evidence of all the witnesses, and we have no hesitancy in saying, after a careful consideration of the history, nature and character of this new enterprise, that the decree and judgment rendered by the trial court is fully supported by the testimony elicited upon the trial and is in harmony with good conscience, justice and equity.

The decree and judgment of the trial court should be affirmed, and it is so ordered.

All concur.