[No. 18460. Department One. April 3, 1924.]

# D. D. McFARLANE et al., Respondents, v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY et al., Appellants.[1]

RAILROADS (53)—INJURIES TO LICENSEE ON TRAIN. One employed to furnish meals for a railroad bridge crew is a licensee for pay or with an interest to whom the railroad company owes the exercise of ordinary care in the movement of its trains.

SAME (53)—INJURY TO LICENSEE ON TRAIN—SUDDEN STOPS—NEGLIGENCE—QUESTION FOR JURY. The question of the negligence of an engineer on a freight train in making an "emergency" stop, instead of a "service" stop, thereby causing an injury to one employed as a cook on a work train, is for the jury, where there was an excessively violent shock such as does not ordinarily accompany a "service" stop, and there was evidence that the caboose traveled approximately not more than the amount of the slack in the train, showing that the engine stopped suddenly on the giving of the signal.

MASTER AND SERVANT (83, 87)—RAILROADS—CONCURRENT NEGLIGENCE—INSTRUCTIONS. In an action against a railroad company and its engineer for injuries sustained by a licensee on the train through a sudden stop, it is proper to instruct that the employee is the agent of the company, which would be liable for the wrongful acts of the agent.

RAILROADS (55)—INJURY TO LICENSEE ON TRAIN—CONTRIBUTORY NEGLIGENCE—INSTRUCTIONS. In an action by one employed as a cook on a work train, for injuries sustained by a sudden stop while she was preparing a meal, evidence of a custom to prepare meals en route warrants an instruction that such preparation of meals would not be contributory negligence, and that she assumed only the risks necessary to an ordinary passage on a freight train handled in a careful manner.

SAME (55). In such a case, it is proper to instruct that plaintiff would not be guilty of contributory negligence in placing a pot of boiling coffee on the range where it would not ordinarily be thrown by the usual jar and jolt of the train without some extraordinary jolt.

TRIAL (124, 125)—VERDICT—POLL OF JURY—ASSENT TO VERDICT—MISTAKE. The return of the jury to the jury room, required by Rem. Comp. Stat., § 359, is not necessary where one of three jurors

[1]Reported in 224 Pac. 581.

answering that they did not agree to the verdict, stated, on interro-
gation by the court, that his answer was a mistake and he intended
to say "yes" instead of "no."

Appeal from a judgment of the superior court for
Pierce county, Askren, J., entered August 1, 1923, upon
the verdict of a jury rendered in favor of the plaintiffs,
in an action in tort.   Affirmed.

*Geo. W. Korte, H. S. Griggs,* and *L. R. Bonneville,*
for appellants.

*Govnor Teats* and *Ralph Teats,* for respondents.

MACKINTOSH, J.—This case concerns a coffee pot and
a freight train.

The testimony, as it must have been found by the
jury, showed that the respondent, Mrs. McFarlane, was
employed by the appellant railway company under a
written contract to furnish meals for the appellant's
bridge gang crew working at various points along the
branch line of the railway known as the Tacoma &
Eastern Railway.   The bridge gang had been working
at the station at Mineral, and upon the completion of
the work there were ordered to work on a bridge near
the station of Alder, this being the third station from
Mineral towards Tacoma.   The respondents, who had
charge of the outfit cars under their contract, put their
eight cars in shape to be attached to a freight train.
One of these outfit cars consisted of the cook car in
which there was a cook range with a flat top, with no
guards around it, and which stood against the side of
the car, leaving a passageway between it and some bins
and shelves on the opposite side.   The freight train
was made up at Mineral and consisted of an engine
and tender, followed by a way freight car, twenty-six
empty flat logging cars, thirteen loaded cars, and the
eight outfit cars, ending up with the caboose, making
a total of forty-nine cars.

About eleven o'clock in the morning, this freight train started from Mineral for Tacoma. At that time the respondents were working around the cook car and had placed on the stove a coffee pot containing about three gallons of water, preparatory to making the coffee and preparing the noon meal for the bridge gang. The first stop, made at Park Junction, resulted in a severe jolting, but no damage was done. The train then left Park Junction with the three gallons of boiling water in the coffee pot, which had been placed at the back of the stove to keep it from getting any hotter, and proceeded to Elbe, where a stop was made with the engine opposite the depot for the purpose of "spotting" the way car next to the tender. This stop was made without jolting and jarring, and it was after this stop that the accident happened which is the basis of this suit.

The second movement of the train at Elbe consisted of this: the train went forward some 1,400 feet for the purpose of picking up four or five loaded cars situated on the house track and to cut the train in two on account of the steep grade between Elbe and the next station ahead, in order to take the forward portion with the empty freight cars and set them out at the next station, called Reliance. This done, the engine would return and move the balance of the train. The second movement was also had for the purpose of clearing the highway, which crosses the railway company's tracks some 600 or 700 feet east of the Elbe station. The track at Elbe makes a curve of approximately ten degrees, and it is therefore impossible for the engineer to see the rear end of a train as long as was this freight train, and he must receive his signals by relay. As we have noted, when the train stopped at Elbe, practically its whole length was opposite the depot and the cars across the highway. On making the second

movement at Elbe, the conductor stood near the highway so that he could see when the caboose had cleared it. He passed the signal on to one Hubbard, who stood a little distance to the west of the highway; Hubbard passed the signal to Weiland, and he to Duffy or to the engineer, Hendricks. The train started up and acquired a speed of from five to eight miles an hour. The conductor gave a slow signal to stop, when the caboose was not quite over the crossing. This signal was passed to Hubbard and from him to Weiland, who gave the same signal to the engineer and the train stopped. When the caboose stopped it had just cleared the crossing. The highway at this point is approximately forty feet in width.

On freight trains there is a slack action of approximately ten inches between the ends of each two cars, or a slack action of the forty-nine cars in this train of approximately forty feet. When this stop was made, the slack action resulted in a jolting and jarring that, according to the testimony of several experienced witnesses who were subjected to it, was of very extraordinary severity, even for a freight train. It resulted in the sliding of the coffee pot from the range and the spilling of its boiling contents over the leg of Mrs. McFarlane, who had been thrown by the jar to the floor of the cook car in the passageway between the stove and the bins and shelves, resulting in her serious injury, to recover damages for which this action was brought.

The complaint alleges several acts of negligence on the part of the railway company occasioning the injury, but all of these claims of negligence were withdrawn from the jury except one, which was that the appellant Hendricks, the engineer of the train, "with the knowledge of the makeup of the train, negligently caused his engine in the front end of the train to so sud-

denly stop that the balance of the train slammed ahead with such terrific force and unnecessary violence that Mrs. McFarlane was thrown to the floor and a large coffee pot thrown across the range and the contents spilt upon her, scalding and. burning her.'' We have, therefore, the question to consider, whether the evidence was sufficient to establish this act of negligence.

It may be taken as conceded that the railway company owed to Mrs. McFarlane not that degree of care which is owing to a passenger, but that which is due to what the courts have called ''a licensee for pay'' or ''with an interest,'' to whom the railway company owes the exercise of ordinary care. *Brown v. Sullivan*, 71 Tex. 470, 10 S. W. 288; *Campbell v. Harris*, 4 Tex. 636, 23 S. W. 35; *Tinkle v. St. Louis & S. F. R. Co.*, 212 Mo. 445, 110 S. W. 1086; *Etchison v. Lusk*, 195 Mo. 188, 190 S. W. 345; *Pugmire v. Oregon Short Line R. Co.*, 33 Utah 27, 92 Pac. 762, 13 L. R. A. (N. S.) 565. It is to be noticed that this action is based on the common law liability. *Luby v. Industrial Insurance Comm.*, 112 Wash. 153, 191 Pac. 855. It is unquestionably true that there is more or less jarring and jolting in the stopping and starting of any freight train, on account of the slack, but if proof was produced which showed that there was an extraordinary disturbance when this train stopped, the question arises as to whether that was the result of negligence or was the natural result of· the ordinary operation of the train under all the circumstances.

The appellant produced evidence tending to show that, on account of the curve, the sag in the track and the irregularities of the track, and the fact that the rear end was on a heavy grade going up, when the train stopped at Elbe, and the head end on a down grade— ''out on a snag and over a hump,'' these physical conditions were the real cause of the slack running in so

violently. It is claimed that the engineer was, therefore, powerless to "bunch the slack" and prevent its running in. The appellant's witnesses also testified that the engineer started the train with a light throttle, in order to get the slack out, graduating the steam lightly until a speed of about five miles an hour had been obtained, then shut off the throttle and allowed the train to drift along six or eight car lengths until he received the signal to stop; that he then made a "seven-pound brake reduction" and stopped within 120 or 130 feet, with the brake pipe exhausting. Under the testimony, this is what is called a "service stop." According to the witnesses, if such a stop had been made, it would be the ordinarily careful and prudent way in which to operate the train, and the appellant would not be liable therefor. But the jury had the right to determine that that was not the manner in which this train was stopped; that, in fact, what is known as an "emergency stop" was made, which would not be an ordinarily careful and prudent way to stop, as an emergency stop is only justified, under the rules of the company, "where life or property is in danger" and "may be used only to avoid injury and damage to persons or property." No such situation, of course, was here, and the question therefore for the jury to determine was whether in fact a "service" or an "emergency" stop had been made. In substantiation of respondents' claim that it was an "emergency" stop, we find the excessively violent shock which ordinarily does not accompany a "service" stop (*Wile v. Northern Pac. R. Co.*, 72 Wash. 82, 129 Pac. 889; *Atwood v. Washington Water Power Co.*, 79 Wash. 427, 140 Pac. 343, and *Tinkle v. St. Louis & S. F. R. Co., supra*), and also the testimony of the appellant's conductor himself, which we have before referred to, showing that, from the time he gave the signal at the rear of the

train for the purpose of having it clear the highway, the caboose traveled not much more than forty feet, which was approximately the exact amount of slack in the train; or, in other words, that immediately upon the signal to stop being given, the engineer stopped, and that the distance covered by the rear of the train after the giving of the signal was only such distance as was made by the thrust of each car into the one ahead, that is, taking up the slack. From this evidence the jury could very well find that the engineer did not make the "service" stop which he testified to, but that, when he received the signal to stop, he "stopped right there," as the "emergency" stop was described by one of the witnesses, and that the cars ran in on their slack until the caboose was reached, and that this running in created the unusual agitation. This case does not fall within the rule of those cases which hold that there is a failure of proof when the jury is allowed to conjecture whether the negligence of the railway company or an unavoidable accident had occurred, or whether the injury was the fault of the injured party.

The motions for directed verdict and for judgment notwithstanding the verdict were properly denied.

Error is assigned upon the giving of instructions which told the jury that an employee while conducting the business of the employer is the latter's agent, and that the employer is liable for the wrongful actions of such employee or agent. This instruction is not subject to the criticism that it laid upon the railway company the liability for any act of the employee, but is in conformity with the rule laid down in *Lough v. John Davis & Co.*, 30 Wash. 204, 70 Pac. 491; *Howe v. Northern Pacific R. Co.*, 30 Wash. 569, 70 Pac. 1100, 60 L. R. A. 949; *Doremus v. Root*, 23 Wash. 710, 63 Pac. 572, 54 L. R. A. 649; and *Sipes v. Puget Sound Elec. Co.*, 54 Wash. 47, 102 Pac. 1057. It was a proper instruction,

especially in view of the fact that the engineer of the appellant was made a co-defendant with the railway company.

Objection is made to an instruction which informed the jury that if it was customary for the employees of the railway company to eat their meals en route or immediately on arriving at the point of destination, and it was necessary for the respondent to prepare her meals for the accommodation of the company's workmen, the preparation of the meals en route would not be negligence on her part and that she only assumed the risk necessary to the ordinary passage on a freight train which might result from the reasonably careful handling thereof, and that she might proceed on the assumption that the train would not be handled in such a way as to produce extraordinary jolts, slams and jars through the negligence of the engineer. The objection is that the evidence did not justify this instruction, because there was no evidence concerning the custom of the employees eating en route. The evidence, however, shows that the custom of preparing the meals en route was an established one and that it was so well known that it must have been notice to the parties here concerned.

Another instruction objected to was one which advised the jury that if they found the pot of boiling coffee had been placed on the range at a point where it would not ordinarily have been thrown by the usual jar and jolt of the train, but would require some extraordinary jolt to cause it to slide off the range, then Mrs. McFarlane "would not be guilty of negligence in placing a boiling pot of coffee at the back of the range." The evidence justified this instruction and we find no error in it.

The next error relates to an incident occurring in court when the verdict was returned. A sealed verdict

had been agreed upon during the night, and, upon the convening of court the following morning, the jury was brought in, and after the verdict had been opened and read, the jury was polled to determine whether it was the verdict of each of them, whereupon three jurors answered that it was not their verdict. The court then inquired as to how this situation arose, to which the foreman replied that one of the jurors then denying his verdict had agreed to the verdict the night before. The court then interrogated this juror, who stated that his answer was made through misunderstanding, that the verdict was actually his verdict and that, when his name was called, he should have answered "yes" instead of "no." The situation is not unlike that in *Rice Fisheries Co. v. Pacific Realty Co.*, 35 Wash. 535, 77 Pac. 839, and in *Cameron v. Stack-Gibbs Lumber Co.*, 68 Wash. 539, 123 Pac. 1001, under which the court is empowered to make such inquiry of the jury to clear up any misunderstanding. Section 359, Rem. Comp. Stat. [P. C. § 8522], provides that "In case ten of the jurors do not answer in the affirmative the jury shall be returned to the juryroom for further deliberation." *Coughlin v. Weeks*, 75 Wash. 568, 135 Pac. 649. But this is not necessary where an examination by the court reveals that a mistake has been made in the answer returned by a juror and that that mistake can be corrected by the juror's changing his vote. As was said in *Rice Fisheries Co. v. Pacific Realty Co., supra*:

"The statute does not say that they shall be *immediately* sent back to the jury room, and there is nothing in the statute to prohibit more than one poll, if the court believes a mistake has been made, or if informed by a juror that he desires to change his vote. . . . There seems to be no good reason therefore, why a

juror should not change his vote in the presence of the court.''

The final error is that the verdict was excessive and the result of passion and prejudice. The verdict was reduced by the trial court, and an examination of the record does not show that, in any event, it was the result of passion or prejudice. The amount finally allowed by the court was well within amounts that this court has sustained in cases involving injuries no more severe and we see no reason for interfering.

Judgment affirmed.

MAIN, C. J., HOLCOMB, TOLMAN, and PARKER, JJ., concur.