ASH GROVE LIME AND PORTLAND CEMENT COMPANY, a Corporation, Appellant, v. OTIS R. WHITE and A. LELIAN WHITE, Respondents, No. 42168—238 S. W. (2d) 368.

Division One, April 9, 1951.

*Harold T. Lincoln, Paul R. Stinson* and *Dick H. Woods* for appellant.

*Neale, Newman, Bradshaw, Freeman & Neale, Ransom A. Ellis, Jr.,* and *Flavius B. Freeman* for respondents.

**[369]** VAN OSDOL, C.—Action by plaintiff, Ash Grove Lime and Portland Cement Company, a corporation, for specific performance of a contract for the sale of real property, a tract of 258 acres of land near Galloway. The trial court denied specific performance, and ordered the dismissal of the action on the stated grounds "there never was a binding contract to sell between the plaintiff and defendants, and that if there were, it would be inequitable to compel defendants to comply with it." Plaintiff has appealed.

In their answers defendants had asked affirmative relief. Among other allegations, defendants had stated the plaintiff's agent, in inducing defendants, husband and wife, to enter into the contract to sell their property, had made statements with the intent to deceive defendants, and defendants were deceived and tricked by the agent's false representations as to the true identity of the purchaser. Defendants prayed the court to adjudge the contract to be void and of no effect; or in the alternative (should the court find the contract to be valid) defendants prayed the court to adjudge the specific performance of the contract would be inequitable, and to deny the relief sought by plaintiff.

Plaintiff-appellant, Ash Grove Lime and Portland Cement Company, operates quarries and kilns and manufactures lime and cement on a large tract of land lying east of the land of defendants-respondents. The western line of plaintiff's land is about 135 feet east and across a highway from the eastern boundary of defendants' property. Defendants' improved property of 260 acres is operated as a dairy farm. The improvements consist of a new dwelling costing $30,000 to $35,000, an old dwelling house, three barns and a milk house. Defendants occupy the new residence as their home. Plaintiff's present operation of its quarries and kilns is about one-half mile east of the improvements located on and near the southeast corner of defendants' 260-acre farm.

Plaintiff, being desirous of acquiring "additional rock reserves," requested Carl Morris, its general superintendent at Galloway, to "contact" some real-estate firm at Springfield and to ascertain if certain tracts of land, including defendants' property, could be bought. Morris contacted Phonso Fortner, a salesman for O. L. Burger who was doing real-estate business as O. L. Burger Company at Springfield. Morris informed Fortner that "he only wanted one man to know about it." However, Fortner felt he was obligated to tell Burger, and Burger assigned the task of interviewing defendants

to his salesman, Paul Miller, who was well acquainted with defendants. They had belonged to the same church for five or six years. Sub-sequently, Burger, Miller and Fortner went to Kansas City to confer with plaintiff's executive vice-president. There Burger was authorized to acquire defendants' property for $60,000, but plaintiff's instructions were "not to disclose the identity of Ash Grove."

Pursuant to Miller's negotiations, defendants signed the contract herein involved, dated June 15, 1949, stipulating the sale of their farm, except two acres in the southeast corner thereof on which their new house is located, to O. L. Burger, agent, for $60,000.

The trial chancellor found the contract when signed by defendants was a mere offer to sell and the offer was revoked before acceptance by plaintiff. And, although the chancellor was of the opinion plaintiff's agent made no misrepresentation of fact which would justify the rescission of the contract (assuming the contract was otherwise binding), yet plaintiff's agent "did create in the minds of defendants the impression that the buyer was an individual who wanted the land for stock pasture, a use acceptable to them, whereas a quarry within a few hundred feet would be [370] highly objectionable. - - - The equities of the transaction are not in favor of the plaintiff."

In this case, an equitable action, the appellate court determines the cause *de novo*, weighing the evidence introduced upon the factual issues; and, although the appellate court will usually defer to the findings of the trial chancellor where there is conflicting verbal testimony involving the judging of the credibility of the witnesses who appeared before him, the appellate court cannot escape its responsibility and duty of weighing the evidence and reaching its own conclusions. Edinger v. Kratzer, Mo. Sup., 175 S. W. 2d 807; Cobble v. Garrison, Mo. Sup., 219 S. W. 2d 393.

Having examined the record, we have the view the trial court's judgment dismissing plaintiff's action for specific performance was justified and a correct one; but we differ from the learned trial chancellor's view that the representations of plaintiff's agent in inducing defendants to sign the contract selling their property would not, in this equitable action, justify a rescission of the contract. It is our opinion the trial court's judgment should be modified to include the relief of cancellation of the contract, for which relief defendants had asked, in effect, by one of the alternative prayers of their answer. Having arrived at this conclusion, it is unnecessary for us to examine appellant's contention the trial chancellor was wrong in finding the parties had never entered into a contract otherwise binding.

In showing why we have come to the conclusion the contract should be canceled, we will review evidence of the statements made by plain-

tiff's agent to defendants in inducing defendants to sign the contract to sell their property.

Defendants introduced evidence tending to show Paul Miller called at defendants' home—asked them if they would sell their place. Miller told them he had "a man" who was interested in buying it. Defendants said they would rather sell the "back eighty" and keep the rest of their farm, and Miller said he had no calls for unimproved land. Miller did not tell defendants who the prospect was. Miller said he had told "the man that we (defendants) had built a nice home on it, and he said the man said, 'Well, I can use it—I can use the new house.'" Defendants priced the farm, without the new house, at $60,000, or with the new house at $100,000. Miller thought the price was high, and defendants suggested the property was close to Springfield and there was possibility a highway (Highway 65) would be relocated near the property, but Miller said, "Oh, I can tell you definitely that it is going out Campbell Street Road." ("Campbell Street Road" is a considerable distance west of defendants' property. Within "going on five years" the relocation of Highway 65 "out Campbell Street Road" has not been contemplated by the State Highway Department, according to the testimony of the Department's division engineer at Springfield. Highway 65 is now to be relocated, by reasonably definite plans, across the northeast corner of defendants' farm.) Miller wanted to know "'about this lime company on the east of you here, doesn't that bother you.' And I (defendant husband) said, 'Well, not to speak of,' I said, 'it shakes our house when they blast, and some noise when the wind is from that direction, but,' I said, 'they are moving away (working to the eastward) from us now and it isn't too bad.'" This first interview was some time in late May or early June 1949.

On the second interview, June 15th, Miller again came to defendants' home. He brought a contract. The first question was, "who had bought the place." But Miller said, "I can't tell you, I promised the man I wouldn't tell." Defendants asked, "why," and he just answered, "I don't know." Miller said the man had argued about the price being too high, and wanted to offer $58,000, but Miller said he had argued with the man who had finally agreed to pay the $60,000. Defendants reminded Miller that no prospective purchaser had inspected the property, and Miller said, "Well, the man knows the place." Defendants asked Miller what the purchaser intended to use the land for, [371] and would the purchaser be interested in buying defendants' dairy herd, but Miller said, "No - - - I think he plans running beef cattle on it." Defendants expressed the desire to keep their cows until the next spring and asked if they might "lease the place," and Miller replied, "the man naturally expects to make a return on his investment."

After defendants had signed the contract, Miller told defendant husband that plaintiff was the purchaser, but Miller said, "you must not tell who it is - - - you don't have a thing to worry about it, they are only buying for protection." Defendant wife did not learn the identity of the purchaser until the following Sunday, and the next day, Monday, defendants undertook to repudiate the transaction.

Miller, plaintiff's agent and witness for plaintiff, testified he had told defendants, "I couldn't identify the purchaser." He made that remark "because they asked me. - - - I referred to the purchaser as 'an old gentleman' at one time. I might have said 'a man' at another time. - - - But I didn't think that had anything to do with the selling or buying of the property." Upon being asked if he remembered that defendant husband had inquired "what the man was going to do with the place," Miller answered, "He did ask me and I told him he would probably run cattle on it - - - possibly might run hogs on it, and he wanted the old improvement because he wanted a tenant on it." He did not categorically deny, but said he could not remember saying anything concerning there being no calls for unimproved land, nor did he remember defendants' saying they would like to sell the "back eighty." Ash Grove was not mentioned. If he had been intending to deceive defendants he would not have told them who the purchaser was. But this was after the contract was signed—"Would have no occasion to tell them before." He had told defendants he "thought" Highway 65 would be relocated down Campbell Street Road. A surveyor, surveying on Campbell, had told him so.

Here we have no real conflict in the verbal evidence. Defendants, as witnesses, testified positively and consistently with each other relating to the conversations had during Miller's two interviews with them leading up to the signing of the contract. Miller admitted he did refer to the purchaser as "an old gentleman" and "the man," and in his testimony he repeated his conversations with defendants in which conversations he had several times referred to the purchaser by the use of the pronoun "he," for example, "he would probably run cattle on it." Giving credence to defendants' testimony, we say Miller effectively covered up the fact that plaintiff was the prospective purchaser. Miller told defendants he had "a man" who was interested in their farm. Miller had "no calls for unimproved land." The "man said, '- - - I can use the new house.' " Miller said he couldn't tell who the purchaser was—"I promised the man I wouldn't tell."

From what Miller said, defendants were given to understand that some man was interested in buying their farm. This man was an elderly person of means who could buy their property with or without the new house. The man resided in the locality—he knew defendant's farm. He might buy the whole improved farm—he could use

the new house. However, he was skeptical about the lime company's operation and its effect upon the desirability and value of defendants' property. He would buy the land without the new house. The old gentleman was considering buying the property as an investment; he expected it to yield an income; he would probably run beef cattle on it.

Defendants asked who the purchaser was. Plaintiff's agent did not have to say anything, but whatever he said should have been true.

Miller deceived and misled defendants. But we do not say he intended to do so. It may be he did not, as he said, know his deceptive statements "had anything to do" with the purchase of the property. The statements may have been thought by him to be merely clever ways to induce the sale and yet follow the instructions of his principal. But his statements were at least constructively fraudulent.

[372] Ellenburg v. Edward K. Love Realty Co., 332 Mo. 766, 59 S. W. 2d 625, was an action seeking rescission of the purchase of notes because of alleged false representations that the notes were secured by a first lien upon realty. Defendant's secretary, Dudley, and "the lady in the office," Miss Hunt, did not affirmatively represent the paper was secured by a first mortgage, but they had said defendant "dealt only in first mortgages." Defendant and agents did not know the notes were not secured by a first mortgage, and they had no intention to deceive plaintiff. This court, in reviewing the cause, approvingly quoted 12 R. C. L., Fraud and Deceit, § 100, p. 345, as follows, "False representations which are made with knowledge of their falsity, and with a fraudulent intent, are, of course, ground for relief in equity as well as at law. As a general rule, however, courts of equity will grant relief in such cases, by way of rescission or otherwise, even though no fraudulent intent on the part of the person making the representation is shown, and though he made them innocently, as a result of misapprehension or mistake. All that need be shown under such circumstances is that the representations were false and actually misled the person to whom they were made. The reason generally given for the rule is that courts of equity may grant relief on the ground of constructive fraud such as would not authorize relief by way of an action of deceit at law."

Returning to our case—the deception as to the identity of the purchaser was a material one. The evidence tends to show plaintiff's quarrying and manufacturing operations require blasting, and are attended by noise, dust and smoke. The contract induced by plaintiff's agent, as stated, did not include two acres and defendants' new dwelling. It is not enough for plaintiff to say that plaintiff, having acquired the absolute title to defendants' remaining 258 acres, might not use the land in their quarrying and manufacturing operations for ten, twenty-five or fifty years. It is enough for defendants to say

plaintiff could at any time do so. Defendants' witnesses did not make any estimate of how much defendants' new residence and two-acre plot would be depreciated in value were the unrestricted ownership of the outlying 258 acres of land vested in plaintiff; however, they said there probably would be some depreciation. But if quarrying operation were commenced in the vicinity of the residence, it would reduce the market value of the (two-acre) residence property $15,000 or $20,000. It may be readily inferred defendants would not have signed a contract to sell the outlying 258 acres, yet retaining their residence, had they known plaintiff was the purchaser. Plaintiff's executive vice-president thinks a residence in the near vicinity of plaintiff's plant would not be particularly desirable. He said, ''I wouldn't build a house there.''

It is a general doctrine that, if either party to a transaction conceals some fact which is material, which fact is within his own knowledge, and which it is his duty to disclose, he is guilty of fraud. But it has never been contended a vendor in a contract of sale is bound to disclose all facts which, if known by the buyer, would prevent or tend to prevent his making the purchase; much less has it been maintained that the buyer is bound to reveal all facts known to himself which would enhance the value of the article sold or affect the conduct of the vendor (except where the parties stand in some fiduciary relationship to each other involving the requisite exercise of good faith). While these stated propositions are admitted, it is said, on the other hand, it is only *silence* which is permitted. ''If in addition to the party's silence there is any statement, even any word or act on his part, which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent.'' Vol. 3, Pomeroy's Equity Jurisprudence, 5th Ed., §§ 901-901a, pp. 545-549; Ellenburg v. Edward K. Love Realty Co., supra; Tinker v. Kier, 195 Mo. 183, 94 S. W. 501; Burton v. Maupin, Mo. App., 281 S. W. 83; [373] White Tower Management Corporation v. Taglino, 302 Mass. 453, 19 N. E. 2d 700; Hays v. Meyers, 139 Ky. 440, 107 S. W. 287.

In the Taglino case, an action for specific performance, defendants, husband and wife, had refused to carry out an agreement to sell land on the ground they were induced to enter into the contract by false and fraudulent representations made by one Taylor, agent of plaintiff, in the negotiations leading up to the execution of the agreement. The agent Taylor knew defendants would not enter into such an agreement if the purchaser were to be plaintiff, a corporation engaged in the restaurant business. The agent concealed from the defendants the fact that he was the agent of the plaintiff corporation, and by misrepresentation led the defendants to believe that one or

two individuals were to purchase the premises for the erection of a dwelling house thereon. Said the Supreme Judicial Court of Massachusetts, "The evidence as reported tends to show no mere concealment of the name of the purchaser. From the testimony of Taylor himself, as well as from that of the defendants, it appears that while Taylor did not affirmatively state that the plaintiff was not his principal, nevertheless he did represent that two individual buyers living in the Back Bay were the purchasers. Taylor admitted that the defendants asked him whom he represented. He was not bound to answer, but if he did, he was bound to tell the truth. - - - The affirmative statement that two people or a family consisting of two was the purchaser was, in the circumstances, a representation that the plaintiff was not the prospective purchaser." The reviewing court ruled that the evidence justified the trial court's denial of the relief of specific performance and, moreover, that *rescission* was warranted.

Plaintiff-appellant herein endeavors to differentiate the Taglino case on the point, among others, that the opinion affirmatively discloses the vendee-plaintiff did not contend it was not bound by the agent's misrepresentation. In the instant case plaintiff-appellant does contend that "even if Miller's oral references to 'the man' and the 'old gentleman' were material, those statements were outside not only the real but also the apparent scope of his authority." But the "oral references" were made in inducing the very contract the agent was authorized to procure. Eisenbeis v. Shillington, 349 Mo. 108, 159 S. W. 2d 641; Ellenburg v. Edward K. Love Realty Co., supra. And, we further say, as the Supreme Judicial Court of Massachusetts said in the Taglino case, plaintiff "ought not to be permitted to take the benefit of false and fraudulent misrepresentations made by its agent." Restatement, Agency, § 259; Vol. 3, Pomeroy's Equity Jurisprudence, 5th Ed., § 909, pp. 570-573; 3 C. J. S., Agency, § 236 f., pp. 155-157.

The judgment should be modified and, as modified, should be affirmed.

It is so ordered. *Lozier, C.*, doubtful; *Aschemeyer, C.*, concurs.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.