The J. R. WATKINS COMPANY, a Foreign
Corporation, Plaintiff-Appellant,

v.

Leonard Ralph HENSON, Henry Evert Sort-
er and Ethel Lee Sorter, Defendants-
Respondents.

No. 7718.

Springfield Court of Appeals.

Missouri.

Oct. 11, 1958.

Everett Frieze, of Bolivar, for appellant.

Joe W. Collins, Stockton, for respondents.

McDOWELL, Judge.

This action was brought in the Circuit Court of Cedar County, Missouri, to recover $676.63, balance due for goods and merchandise sold defendant, Leonard Ralph Henson, as principal, and defendants, Henry Sorter and Ethel Sorter, as sureties. The cause was tried by the court, jury waived, and judgment entered for plaintiff against defendant, Henson, for $146.26, and for defendants, Henry Sorter and Ethel Sorter. Plaintiff appealed.

The petition, in substance, alleged that on April 28, 1955, plaintiff entered into a written contract with defendants whereby it sold and delivered to Leonard Ralph Henson, between May 13, 1955, and August, 1955, products and merchandise in the value of $1,442.84; that no part of the purchase price of said goods has been paid except $766.21, credit given for returned merchandise and that there now remains due and unpaid $676 63 for which amount plaintiff prays judgment with interest thereon at the rate of 6% per annum.

The answer is a general denial.

The written contract is as follows:

"This Agreement, made at Winona, Minnesota, this 28 day of April, 1955, between The J. R. Watkins Company, a corporation, hereinafter called "the Company", and Leonard Ralph Henson of Fairplay, Mo., R. No. 2 hereinafter called "the Purchaser", witnesseth,

"1. That in consideration of the promises and agreements of the Purchaser hereinafter contained, to be kept and performed by him, the Company agrees, unless prevented by fire, strikes, or other cause, to sell and deliver to the Purchaser, at its current wholesale prices, free on board cars at Winona, Minnesota, or at its option, at any of its other regular places of ship-

ment, such goods and other articles manufactured or sold by it, as the Purchaser may reasonably require for sale, from the date hereof, until the first day of December, 1957, in the locality in which he is now engaged, or intends to engage, in business, a description of which locality he agrees to furnish and deliver to the Company in writing prior to its acceptance of this agreement; but the furnishing of such description may be waived by the Company at its election, without notice to the Purchaser or the sureties hereon.

"2. And in consideration thereof, the Purchaser agrees to buy from the Company the goods reasonably required by him as aforesaid; and agrees to furnish to it complete, regular, weekly, written records, showing separately the amounts of his cash sales, time sales, and collections; which records, however, or any of them, may be waived by the Company without notice to the sureties hereon, and he also agrees to furnish a complete financial statement when requested to do so.

"3. The Purchaser further agrees to pay the Company its current wholesale prices for the goods and other articles sold to him, as herein provided, and also the prepaid transportation charges thereon, if any, by remitting to the Company each week at least sixty per cent (60%) of the amount received by him from his cash sales, and from his collections on sales previously made, at the time and in the manner and in accordance with the provisions of the weekly record blanks of the Company to be furnished to him; and, at the expiration or termination of this agreement, to pay the whole amount therefor then remaining unpaid; or the Purchaser may pay for such goods in cash, less the usual cash discount allowed for such payments; but such payments, or any of them, may be waived or extended by the Company without notice to the sureties hereon, and without prejudice to the rights or interests of the Company.

"4. If the Purchaser shall not pay cash for said goods and other articles so sold

and delivered to him, and the payments at the time and in the manner hereinbefore provided are insufficient to pay therefor, the Company may, in its discretion, thereafter either limit the sales herein agreed to be made, or from time to time suspend the same, or require cash with each order, or cash upon delivery, until the Purchaser's indebtedness is paid, or reduced, as the Company may require.

"5. The Purchaser may, within thirty days after the expiration or termination of this agreement, return, by prepaid freight, to the Company, at Winona, Minnesota, Memphis, Tennessee, Newark, New Jersey, or Oakland, California, in as good condition as when delivered to him at point of shipment, any goods purchased by him from the Company, which he may then have on hand; and the Company agrees to repurchase such goods, in the units and combinations purchased, if in such condition when received by it, and pay or credit the Purchaser therefor at the invoiced prices or at the Company's then prevailing wholesale prices, whichever shall be lower. And, if any goods returned by the Purchaser are not in a salable condition when received by the Company at any of the places above named, the Company will restore them to such condition, if that can reasonably be done, and make a reasonable charge therefor, and deduct such charge from the value of such goods, and pay or credit the Purchaser with the balance. But the Purchaser shall not return, nor the Company pay or allow any credit for, any advertising matter of any kind, or for any goods or articles which have been used, or for any goods which cannot reasonably be restored to a salable condition.

"6. The Purchaser shall have no power or authority to make any statement or representation, or to incur any debt, obligations, or liability of any kind whatsoever, in the name of, or for, or on account of the Company.

"7. The Company shall have no interest in the accounts due for goods, sold by the Purchaser; and no oral or written statements, printed, advertising or other matter of the Company, sent to, or distributed by the Purchaser, shall be construed to direct or control the sale or other disposition of said goods, or to change or modify the terms of this agreement.

"8. Masculine terms of expression herein shall be taken to include the feminine where applicable.

"9. It is also mutually agreed that this is the complete, entire and only agreement between the parties, and that it shall not be varied, changed, or modified in any respect except in writing executed by the Purchaser and by an officer of the Company; and that either of the parties hereto may terminate this agreement at any time, if desired, by giving the other party notice thereof in writing by mail.

"In Witness Whereof, the Purchaser has hereunto set his hand and seal and the Company has caused these presents to be executed in its corporate name by its proper officer, at Winona, Minnesota."

(Signed) "Leonard Ralph Henson (seal)
"The J. R. Watkins Company
By Ralph G. Boalt, President.

"In consideration of the execution of the foregoing agreement by The J. R. Watkins Company, which we have read, or heard read, and fully understand and hereby agree and assent to, and its promise to sell, and the sale and delivery by it, to the Purchaser, as vendee, of goods and other articles, as therein provided, we, the undersigned sureties, do hereby waive notice of the acceptance of this agreement, notice of default or of non payment, and waive action required, upon notice, by any statute, against the Purchaser; and we jointly, severally and unconditionally promise, agree and guarantee to pay for said goods and other articles and the prepaid transportation charges thereon, at the time and place, and in the manner in said agreement provided. And we further severally agree that, in case of the death of one or more of us, the undersigned sureties, before the expiration or termination of this agreement,

his estate shall continue liable with the surviving surety or sureties for all shipments made to the Purchaser prior to receipt by the Company at Winona, Minnesota, of written notice by registered mail of such death."

(Signed) "Henry Evert Sortor, (Seal) Farmer, R 3, Humansville, Mo.

"Ethel Lee Sortor, (Seal) Housewife, Humansville, Mo. R 3."

The evidence shows that plaintiff is engaged in the "manufacture of household and culinary articles, including flavoring extracts, spices, cosmetics, grocery specialties, household necessities, medicinal preparations, hog, stock and poultry mineral compounds and allied products, which it sells outright to customers, absolutely and unconditionally, f. o. b. cars at point of shipment, either for cash or on credit. Before any goods are sold on credit the customers are required to furnish plaintiff with security in the form of a sales and surety agreement, signed by themselves as purchasers, and by other financially responsible persons acceptable to plaintiff as sureties, jointly, severally and unconditionally guaranteeing to plaintiff payment of all indebtedness such purchasers may thereafter incur in the purchase of merchandise from it on credit."

Ralph G. Boalt, Vice-President of plaintiff-company, testified that plaintiff sold merchandise to defendant, Henson, on credit f. o. b. cars at point of shipment, under terms of the written contract sued on, in the amount of $1,140.37; that on June 6, 1955, the company made a charge against the account of defendant in the sum of $265.39 for goods transferred from another customer, to-wit, defendant's wife, who had purchased such goods on credit as agent of plaintiff. No notice was given the sureties of this credit transfer.

Witness stated that the company made two other charges against the account of Henson, one for $21.79 and one for $15.29, the amounts of two checks received from Henson as payment on account, June 6, 1955, and July 13, 1955, on which payment had been refused by the bank. He testified the total amount of payments received from Henson and applied on his account was $126.46, which included the two checks not paid by the bank. Witness said that on June 14, 1955, he gave a total credit to defendant's account of $19.46, amount of goods Henson claimed to have not received, which was charged to him on invoices marked exhibits 6-B and 7-B. He testified these were the only payments made by Ralph Henson on his account except credit for goods returned in September, 1955, in the amount of $620.29. Witness testified that when the returned goods were received the contents were examined by plaintiff to determine whether they were in a salable condition; that a part of the goods returned were rejected in the sum of $268.83 because they were not in salable condition; that expenses incurred in reconditioning the returned goods amounted to $35.20 for labor and materials and $18.74 in repackaging, which amounts were charged to defendant. Witness admitted that plaintiff was notified by defendant that defendant failed to receive two feeders of the value of $39.50, which plaintiff had charged to his account, as shown by defendant's exhibit 13-B.

Plaintiff's evidence is that it informed defendant by letter through the U. S. Mail, dated October 21, 1955, of credits allowed for goods returned, less expenses incurred in reconditioning same, which credits amounted to $620.29; that the total credit allowed defendants was $766.21, leaving a balance due on defendant's account of $676.63.

Plaintiff's evidence is to the effect that the goods sold defendant were ordered by the defendant and were outright sales on credit; that defendant paid the freight and plaintiff retained no claim or lien on such goods; that plaintiff's exhibit No. I contains the sole and entire agree-

ment between it and defendant relating to the account in suit.

Defendant Henson testified that plaintiff's agent, Mr. Starns, wanted him to take the agency for plaintiff's goods for Dade County; that his wife was plaintiff's agent for Cedar County; that the agent fixed out the contract and gave it to him to get character witnesses. He testified that the signed contract had been delivered and approved by the company, and it was to extend from April 28, 1955, to December 1, 1957. He stated he took the contract over to defendants, Mr. and Mrs. Sorter, and told them he needed character witnesses and they signed the same as such. It is admitted that all defendants were notified that the company had approved the contract. Witness said that the sureties had no knowledge of the transfer of goods from his wife's account to his account; that the company terminated his contract and notified him to return the goods on hand; that the company gave him instructions how to package such goods; that he and his wife invoiced all the goods returned, counted every article and listed the wholesale price thereof; that they made a complete, perfect inventory and invoice of the packaged articles returned to plaintiff with a description thereof; that a copy of the amount of goods returned was mailed to plaintiff; that the goods were shipped over the Frisco Railroad from Bolivar to plaintiff's place of business in Memphis; that the total amount of such goods returned was $1,078.08. Witness testified that the company shipped to him two mineral feeders over El Dorado Truck Lines; that he knew nothing of the shipment and that the Truck Lines redelivered the feeders to plaintiff's place of business in Kansas City; that plaintiff charged his account with the value of the feeders, $39.50, and has not given him credit on his account for this amount.

Defendant's evidence is to the effect that the goods returned to plaintiff were carefully packed, shipped, and freight paid thereon; that the goods returned were in salable condition and none of the same was damaged. All of the defendants testified that they were present and saw the goods packed for shipment and that such goods were in good condition at the time they were delivered to the Railroad; that a part of the goods returned were in the original crates received from plaintiff and had not been unpacked. Defendant gave this testimony: "A. Yes, sir. That's what I done, I shipped them to Memphis, Tennessee under their directions that they gave me and paid the freight". Defendant's exhibit 10 is the freight bill where the El Dorado Truck Lines delivered the two dry feeders to J. R. Watkins Company in Kansas City.

Mr. and Mrs. Sorter testified that they were acquainted with defendant and always considered him honest; that he asked them to sign the surety agreement and told them that it was merely a recommendation as to his character; that they were old and did not read it before signing.

The trial court made findings of fact and conclusions of law. He found that the difference between the amount which plaintiff claimed was due and the amount which Henson claimed was due is the damaged merchandise; that the question was, therefore, whether defendant, Henson, should be credited for the damaged merchandise. He found that plaintiff, by letter, ordered Henson to return the merchandise to its Memphis branch and directed how the packing should be done; that defendant followed plaintiff's instructions; that he invited the sureties to inspect the merchandise before it was shipped and they testified that it was packed in good condition. The merchandise was delivered to the Railroad Company at Bolivar and the court found it to be in good condition when so delivered. The court found that if the merchandise was not in good condition when it arrived at Memphis, plaintiff should have refused to accept it so the defendant could have recovered from the Railroad for any damage sustained. He found the presumption must be that the merchandise was in good condition when delivered to plaintiff and that, if not, plaintiff should not have re-

ceived it. The court found that plaintiff, before the trial was called, offered to allow judgment to be taken against defendants for $146.26; that he is indebted to plaintiff in that amount and rendered judgment against Leonard Ralph Henson in favor of plaintiff for $146.26.

The court found for defendants, Mr. and Mrs. Sorter, on the ground that plaintiff had breached its contract with them when it transferred $265.39 worth of merchandise from Marie Henson's open account to Leonard Henson's account, which was done without consent of the sureties; that because of such breach the court rendered judgment for defendants and against plaintiff.

■ It is our duty to review this non-jury case upon both the law and the evidence as in suits of an equitable nature. We must make our own independent findings of fact and reach our own conclusions as to the weight of the evidence. In so doing we give due regard to the opportunity of the trial judge to judge of the credibility of the witnesses. Midland Realty Company v. Manzella, Mo.App., 308 S.W.2d 326, 330; Section 510.310 RSMo 1949, V.A.M.S.; Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289; Minor v. Lillard, Mo.Sup., 289 S.W.2d 1.

■ Appellant's first assignment of error presents nothing for review. Only abstract propositions of law are stated. It fails to comply with the requirements of Supreme Court Rule 1.08 (a) (3), 42 V.A.M.S.

Point II raises the issue of the sufficiency of the evidence to support the trial court's judgment. The right of the parties is determined by the provisions of the written contract sued on. Defendant, Henson, admits that he is indebted to plaintiff in the sum of $146.26 and consented that judgment be entered for that amount.

The primary issue in the case arises from the return of goods and merchandise which defendant, Henson, had on hand at the expiration or termination of the agreement.

Under par. 5 the contract provides that a purchaser may, within thirty days after the termination of the agreement, return by prepaid freight to the company at Memphis, in as good condition as when delivered to him at point of shipment, any goods purchased by him from the company, which he may then have on hand; and the company agrees to purchase such goods, in units and combinations purchased, if in such condition when received by it and credit the purchaser therefor at the invoice price, or at the company's then prevailing wholesale prices, whichever shall be lower. And if any goods returned by the purchaser are not in salable condition when received by the company at any of the places named, the company will restore them to such condition, if that can reasonably be done, and make a reasonable charge therefor, and deduct such charge from the value of such goods and credit the purchaser with the balance. But the company will not allow any credit for goods which cannot reasonably be restored to a salable condition.

The evidence shows that respondent, Henson, returned by prepaid freight to appellant-company, at Memphis, Tennessee, over the Frisco Railroad, goods purchased from appellant in the amount of $1,078.08. These goods were repackaged under instructions from appellant and returned as requested. Respondent testified that the goods were in salable condition when delivered to the Railroad. Appellant rejected a part of the goods returned in the sum of $268.83 as being goods which could not reasonably be restored to a salable condition and charged to respondent, as expenses for reconditioning part of such returned goods, labor in the amount of $35.20 and materials $18.74 for repackaging.

The trial court held that respondent, Henson, should be credited for the amount of the goods returned on the theory that when the goods were delivered to the Railroad they were in good salable condition and packaged as directed by appellant; that if the merchandise was not in good condition when it arrived at Memphis, appellant.

should have refused to accept it so respondent, Henson, could have held the Railroad liable for damages sustained. The court in its conclusions of law stated: "The presumption must be that the merchandise was in good condition when it was delivered to plaintiff and if it were not, the plaintiff should not have received it."

We think the trial court erred under the evidence in this case in basing his judgment upon a presumption. In Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240, 247 [7, 8], the court stated:

"* * * The presumption passed out of the instant case when testimony came in that Gerdeman, who was on the approach to the bridge where he had a good view of the flood waters, was not looking ahead but was looking at the flood. 'A presumption, therefore, of a rebuttable character, such as here [exercise of care], only remains in force until repelled by contrary evidence. It follows that, when the evidence is contrary to the presumption invoked, the presumption itself cannot be laid hold of for use in administering justice in a particular case.'" (See cases cited.)

■ We find that under the terms of the contract, which governs the rights of the parties and determines the issues here presented, as to the return of goods for credit, the court was in error in finding for respondent, Henson, on the ground of presumption. It was the duty of the court to determine the issue under the contract between the parties. The contract provides that the company agrees to repurchase such goods returned, if in as good condition as when delivered to respondent at point of shipment and, if in such condition when received by it, and further provides that it will not give credit for any goods which cannot be reasonably restored to salable condition. The evidence offered that the goods were properly packaged and in good condition when delivered to the Railroad may tend to establish that they were in good condition when received by appellant and may be taken with all the other evidence offered on that issue but there is no presumption raised in favor of respondents as found by the trial court.

■ Under the evidence respondent, Henson, should have been given credit for the two feeders in the sum of $39.50.

■ The trial court found for respondents, sureties, on the ground of breach of contract. The evidence shows that the contract between appellant and respondent, Henson, which respondents, Henry Evert Sorter and Ethel Lee Sorter, signed as sureties, provided that the goods sold by appellant to respondent, Henson, were to be sold and delivered to purchaser, at current wholesale prices, free on board cars at Winona, Minnesota, or at its option at any of its other regular places of shipment, such goods and other articles manufactured or sold by it as the purchaser may reasonably acquire for sale during the period of the contract. The evidence shows that respondent's wife, Marie Henson, had been an agent for appellant-company under a similar contract as that of her husband; that at the termination of her contract, she had on hand unsold goods of the value of $265.39. Under an agreement between appellant-company and the respondent, Henson, and his wife, these unsold goods were transferred and charged to the Henson account. We think this transfer of goods might have increased the burden of the sureties and, certainly, they were not sold under the terms of the contract. The trial court might have found that the sureties were not liable for that amount. The trial court erred in finding for the respondents, sureties, on the theory of breach of contract.

It is unnecessary to pass on the other alleged errors.

Judgment is reversed and remanded for retrial in accordance with this opinion.

STONE, P. J., and RUARK, J., concur.