Louis H. ANTOINE and Daniel L. Schlafly, Plaintiffs-Appellants,

v.

James J. McCAFFERY, Defendant-Respondent.

No. 30258.

St. Louis Court of Appeals. Missouri.

May 17, 1960.

Grand, Peper, Martin & Roudebush, Malcolm W. Martin, George A. Jensen, Robert O. Hetlage, St. Louis, for appellant.

Mortimer A. Rosecan, Irving M. Malnik, St. Louis, for respondent.

BRADY, Commissioner.

The appellants, members of the Board of Education of the City of St. Louis, hereinafter referred to as the Board, brought this action under Section 165.583 RSMo 1949, V.A.M.S., against respondent, President of that Board, seeking to remove him as President and member of the Board because of alleged gross misconduct and disqualification for office.

The pleadings are of importance to a proper consideration of this case. The appellants alleged that the respondent committed gross misconduct within the meaning of Section 165.583 RSMo 1949, V.A.M.S. and is disqualified within the meaning of that statute for his office as a member and President of the Board in that he: (a) caused and directed employees of the building department of the Board to perform services on property held for his son and daughter-in-law during a time when said employees should have been performing their duties as employees of the Board; (b) falsely and fraudulently caused the payment of public funds of the Board of Education to the aforesaid employees for such services, and has not made restitution thereof to the Board; and (c) caused and directed the hours worked by the employees on the house and the compensation therefor to be falsely and fraudulently shown on the records as maintenance or other repair on property belonging to the Board. After alleging that they did not have an adequate remedy at law, the appellants prayed three actions of the trial court: (a) to remove the respondent from his office as member and President of the Board because of his gross misconduct; (b) to restrain, enjoin, and prevent the respondent from causing or directing the payment of any additional moneys from the funds of the Board to the employees for the work performed by them on the house, and (c) to order the respondent to repay to the Board all sums of money paid or transferred to the employees for the services performed by them on the house. The petition included the usual allegation, asking for such other and further relief as the court may deem meet and proper, and thus invoked the broad range of equity powers of the trial court.

The respondent, by answer, denied the allegations of the petition recited above, and for further answer stated: (1) that the petition did not contain sufficient facts under the law to state a cause of action; (2) that the appellant Antoine failed to verify, by affidavit, the allegations of the petition as provided by Section 165.583, supra; (3) that the appellant Antoine had admitted in a deposition taken before a Special Commissioner appointed by the court that he did not personally investigate nor have any personal knowledge of the truth or falsity, accuracy or error of the charges in the petition, and that his filing of this action without such knowledge of the truth or accuracy of the matters contained therein was an unwarranted and unlawful use of his position as a member of the Board, and was " * * * contrary to and defeats the purpose and intent of Section 165.583 conferring jurisdiction in this Court upon the filing of a verified petition by a member of the said board;" (4) that the appellant Antoine had " * * * refused to divulge and make public his source and basis of the charges he makes in his petition herein * * *;" and that such refusal to make full disclosure of the source and basis of his charges has disqualified him and forfeited his right to further prosecute this action; and (5) that the appellant Antoine's admitted lack of knowledge of the truth and accuracy of the matter set out in the petition and his reliance on those whom he refuses to name is " * * * unlawful, frivolous and irresponsible delegation of his statutory responsibilities, rights and duties * * *." The same allegations as to the appellant Antoine were then set out as to the appellant Schlafly.

After a lengthy trial, the trial court took the matter under advisement and on November 7, 1958, made its findings and entered its judgment for the respondent, dismissing appellants' petition at appellants' costs. The findings and judgment of the trial court are found in its memorandum opinion which is a part of the record of this case. Without setting the memorandum out in full, the trial court found: (1) that the appellants had a right to file this suit; (2) that there was no evidence " * * * by any reasonable inference, that materials of the School Board were used in making the repairs;" (3) that Board employees worked at the house; (4) that the em-

ployees were paid by the Board during the period they worked at the home of respondent's son and daughter-in-law, but that there were "adjustments" made, and the pay the employees received was either paid by the contractors or there was an "adjustment" in the employees' pay for the next pay week or the defendant paid some of the employees and the contractors he had hired on the house paid certain other of the employees and " * * * therefore the School Board suffered no monetary loss;" (5) that there was no evidence that respondent had any knowledge of the adjustments made on the employees' next pay week to cover reimbursement to the Board for the amount they were paid while working upon the house. The trial court's allegedly conflicting findings as to the proper burden of proof in this case will be commented upon later herein. Appellants' timely after trial motions were overruled, and they filed notice and have perfected their appeal to this court.

 It is clear that this case does not involve any matters within the exclusive appellate jurisdiction of the Supreme Court as provided by Article V, Section 3 of the Constitution of Missouri, 1945, V.A.M.S., unless the jurisdiction of the Supreme Court may be invoked under the provisions of the Article above cited pertaining to " * * * the title to any office under this state * *." The respondent, as a member of the Board of Education of the City of St. Louis, is an officer under this state within the meaning of Article V, Section 3, supra. State ex rel. Blakemore v. Rombauer, 101 Mo. 499, 14 S.W. 726. The Supreme Court's exclusive jurisdiction based on title to office applies, however, only to those cases where the issue is whether the office holder has title to the office, and not to those cases where the issue was one of removal from office by order of court. In a removal case, as in the case at bar, there is no dispute as to the respondent having title to the office. Compare Eagleton v. Murphy, 348 Mo. 949, 156 S.W.2d 683, 138 A.L.R. 749, where the statute provided for automatic disqualification upon the commission of the offense. Under the statute in

the instant case, the respondent can be removed only by order of the court. See also State ex rel. Goodnow v. Police Commissioners of Kansas City, 80 Mo.App. 206. In the case of Antoine et al. v. Fletcher, Mo. App., 307 S.W.2d 898, a case closely allied to the subject of this opinion, an action was brought by certain members of the School Board of the City of St. Louis to oust from his office the Building Commissioner of the School Board. An appeal was taken to the Supreme Court, and that court transferred the appeal to this court upon motion, stating in its order of transfer that the title to the office was not involved within the meaning of the Constitution of Missouri. The action in the Fletcher case was brought under Section 165.583 RSMo 1949, V.A.M.S. as is that in the case at bar.

Respondent's motion to dismiss the appeal on the grounds that respondent's term of office had expired, and he was not a member of the Board of Education when the case was argued, and that therefore the questions involved have become moot, was taken with the case upon submission to this court.

 There are several reasons why respondent's motion to dismiss is not well taken. The foremost is that the petition, by paragraph 12(c) thereof, prayed for a decree ordering respondent to repay to the Board " * * * all sums of money paid or transferred to the aforesaid employees for the services performed by them on said house held by (respondent's) son and daughter-in-law." Section 165.583 RSMo 1949, V.A.M.S., specifically provides for such repayment. Accordingly, on this review de novo, this issue is presented to us for decision, and therefore, there is an actual controversy between the parties, the decision of which would have a practical effect, and of which the fact that respondent is not now in office would not be decisive. Furthermore, appellants contend that respondent has never claimed there was any repayment or reimbursement for the sums of money that might be character-

ized as "overhead," such as the time office personnel spent in making out time records on jobs allegedly never done, but on which the men working at the house were supposed to be working, or in making adjustments in those records, or for the foreman who is alleged to have supervised the work, or the loss that might have occurred from failure to do the work stated on the time sheets to cover the men's time at this house. We believe these items can fairly be said to come within the provisions of Section 165.583, supra, authorizing the court to order repayment of " * * * all sums of money * * * lost or wasted * * * " and within the allegations of the petition. It follows that this record should be examined to determine if there were in fact any such losses, and the cause, for this additional reason, cannot be said to be moot.

■ Another reason the motion to dismiss should be denied is that there is a matter of great public interest present in this appeal. As this case now stands, the decision of the trial court is that its finding that employees of the School Board did work on a private residence belonging to respondent's son and daughter-in-law, and were paid for that work out of School Board funds, does not constitute gross misconduct, as that term is used in Section 165.583, supra. The testimony of various supervisory employees of the Board was that such a course of conduct as disclosed by this evidence had occurred from time to time in the past. It is obvious that the determination of whether or not such conduct constitutes gross misconduct, or merely, as the trial court characterizes it, "indiscreet" action, is one of such public importance as requires our decision, especially since it involves a determination of public rights or interests under conditions that may, in substance, be repeated at any time. Lawyers' Association of St. Louis v. City of St. Louis, Mo.App., 294 S.W.2d 676.

■ Moreover, where, as above held herein, there are other issues which re-main to be determined, the question of costs should also be considered in determining whether or not this cause is moot. Stegmann v. Weeke, 279 Mo. 131, 214 S.W. 134, State ex rel. Brokaw v. Board of Education of City of St. Louis, Mo.App., 171 S.W.2d 75; compare Dolan et al. v. Richardson et al., Mo.App., 181 S.W.2d 997, where no other issues remained except costs. The record discloses that the cost of the transcript alone in this case is $1,297.80.

In respect to the question of whether or not the issues are now moot, the situation is analogous to that in State on Inf. McKittrick, Atty. Gen., v. Wymore, Pros. Atty., Supreme Court en Banc, 345 Mo. 169, 132 S.W.2d 979. In that case, the court held the issue was not moot because the court had authority to order a fine imposed, and to give judgment for costs in a quo warranto proceeding in addition to ouster, and the court did order a fine and tax costs in addition to ouster, and ruled that in quo warranto actions where the action to remove was instituted before expiration of the term, the action should be prosecuted to its final conclusion, citing Hunter v. Chandler, 45 Mo. 452. Neither can we read Eagleton v. Murphy, supra, as respondent would have us, to find therein an inference that the rule in this state is otherwise as to actions other than quo warranto. All that case holds is that when respondent therein committed an act which violated both a section having a special application to a particular kind of gross misconduct (Section 165.567 RSMo 1949. V.A. M.S.), and a statute covering gross misconduct generally (Section 165.583 RSMo 1949, V.A.M.S.), the rules of statutory construction require that the statute having a particular application to the subject will be deemed a qualification or exception to the general statute. Therefore, the violation was considered under the special act, and that act specifically limited removal or ouster for the balance of the term. See Antoine v. Fletcher, supra, where the case is similarly interpreted. There is no such problem of statutory construction here, and

the section that governs, Section 165.583 RSMo 1949, V.A.M.S., contains no such limitation.

The issue is not moot, and the respondent's motion to dismiss is overruled. The case will be determined upon its merits.

██ Appellants contend that the trial court erred in requiring the appellants to prove their case by clear, cogent and convincing evidence, and therefore the findings of the trial court cannot be given weight by this court. In its memorandum opinion, the trial court stated: " * * * Having filed the suit, the plaintiffs, of course, have the burden of proof and must prove their case by the preonderance, (sic) or greater weight, of the credible evidence that the defendant has committed acts of gross misconduct." Later in that same memorandum, the trial court stated that: " * * * The evidence in this case is conflicting in many respects, and, in this unusual type of case, where plaintiffs seek to oust a public official from office to which he has been duly elected by the people, the evidence must be clear, cogent and convincing that the defendant has committed acts of gross misconduct. And the plaintiff's (sic) evidence *in this respect* fails, in the opinion of this Court." (Emphasis supplied.) This cause must be governed by the same rules as to the weight and sufficiency of evidence as in civil cases generally. It is clear that the trial court did not apply the rule of proof requiring a preponderance of the credible evidence. However, we cannot agree that this fact necessarily compels the findings of the trial court to be disregarded. Neither can we see that that issue is of any importance. This court reaches its own conclusions as to the law and the evidence in this case upon a review of the entire record, as in cases of an equitable nature. Section 510.310 RSMo 1949, V.A.M.S. We have authority to enter such judgment as the trial court ought to have given, and we find, in conformity with the law. Section 512.160 RSMo 1949, V.A.M.S. In reaching our conclusions as to the law and the evidence upon our review of the entire record,

we will apply the correct rule requiring appellants to prove their case by preponderance, that is, by the greater weight of the credible evidence.

██ Respondent urges that appellants' case must stand or fall on the testimony of the witness Williams, and in that connection spent a great deal of his brief in the citation of cases to the effect that the trial court had an opportunity to judge the credibility of the witnesses, and contends that the trial court did not believe Williams and wholly disregarded his testimony and this court must do likewise. Respondent is incorrect as to his contention that the trial court's refusal to credit any of Williams' testimony is binding upon this court. The rule of deference does not go so far, but rather is a rule of necessity and convenience, always limited to the conditions of the testimony in each particular case, Edinger v. Kratzer, Mo., 175 S.W.2d 807. The rule is especially applicable to cases involving conflicting oral testimony which involves credibility. Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620, 622, but even in such cases where conflicting oral testimony involving the credibility of witnesses is involved, the application of the rule is not automatic, and this court can not escape its responsibility to weigh the evidence and reach its own conclusions. Ash Grove Lime & Portland Cement Co. v. White, 361 Mo. 1111, 238 S.W.2d 368. See Midland Realty Co. v. Manzella, Mo.App., 308 S.W.2d 326; J. R. Watkins Co. v. Henson, Mo. App., 319 S.W.2d 21. As the Supreme Court said in Hussey v. Robison, Mo., 285 S.W.2d 603, at loc. cit. 605:

" * * * and, although the appellate court will usually defer to the findings of the trial chancellor where there is conflicting oral testimony involving a judging of the credibility of witnesses who appeared before him, the appellate court cannot forego its duty of weighing the competent evidence and reaching its own conclusions. (Citing cases.)"

The true effect of the rule of deference is stated in McBee v. Twin City Fire Ins. Co., 241 Mo.App. 404, 238 S.W.2d 685, at loc. cit. 688, where the court held:

"While in close cases we must recognize the due deference rule, it does not require us to blindly follow the decision below. Where the evidence. is close and it is difficult to ascertain the true state of facts, where the scales are evenly balanced, the privilege of hearing the testimony and observing the witnesses while testifying may be the grain of sand that tips the scales to a winning side. That is the basis of the due deference rule. But, after considering the advantage enjoyed by the chancellor, if a careful consideration of all the evidence convinces us that a wrong decision has been made, we must not follow the easy way and affirm the judgment. Clinic & Hospital v. McConnell et al., Mo.App., 236 S.W. 2d 384."

■ While we have full authority to determine the weight, if any, to be given Williams' testimony, in ruling upon the question of whether or not respondent should have been ordered removed from office, that testimony will not be considered, nor will it be considered when determining whether or not there was in fact any monetary loss resulting to the Board which respondent should be compelled to pay. The reason is that appellants' burden of proof as to such issues is clearly sustained by other evidence about which there is no dispute as to credibility, and Williams' testimony could therefore only be cumulative on these points.

■ The finding of the trial court as to the right of appellants to bring this action is not, of course, contested, since it is appellants who request our review. However, our review is de novo, and for this reason we rule upon the point. The trial court correctly ruled the question. Section 165.583(2) RSMo 1949, V.A.M.S.

clearly authorizes such an action by a member, or members, of the School Board "* * * or at the instance of any ten citizens and householders of such city, who shall join in such petition, verified by the affidavit of at least one of them." The provisions for verification by affidavit do not apply to this action, since it is brought by members of the Board. The right of a member of the Board to bring the action was recognized in Eagleton v. Murphy, supra. Neither is there any requirement in that section compelling the appellants to state how, or in what manner, they came into the knowledge of the facts alleged in the petition, nor disqualifying them from pursuing the action as a party if they do not do so.

No useful purpose can be served by extending this already lengthy opinion by setting forth herein the testimony, even in digest form. The proceeding was lengthy, the transcript alone consists of 1,433 pages, and there were numerous exhibits. The trial was hotly contested, and the length of the record is an indication of that factor more than it is of the complexities of the issues presented. The case took nine days to try, even though the trial court conducted at least one night session. It is sufficient to state that this record has been exhaustively examined, and in making the findings of fact below stated, the evidence on each point will not be set forth, although it has been as carefully examined and weighed as that stated herein.

■ With respect to the allegations of the petition dealing with the use by respondent of materials belonging to the Board without making restitution therefor, the respondent's own witness, Burgdorfer, his electrical contractor, testified that he saw 30 ft. of ¾" metallic tubing in the basement of this house, that he had supplied none and did not know who did supply it; that he saw approximately 30 feet of #12 BX cable, and that he did not supply any, and did not know who did, that he counted 15 new switches on the first and

second floors of the house, four of which were 3-way switches, and he furnished none of these and did not know who did. The respondent's witness Eisele, a Board employee, testified that the plumbing work he did was with materials supplied by McHenry, the plumbing contractor for respondent, and Peerless Supply Company, and that which was on the job when he got there, that it consisted of some ½″ L-type copper pipe laying in the hallway, consisting of two 20-ft. pieces and two pieces 6-ft. long, a bag with fittings, screws, nails, paste, sand, cloth binders, pot and furnace which he supposed belonged to McHenry. There was also a sweating torch and a tank with a regulator there. He further testified that he used approximately 52 to 55 ft. of ½″ L-type copper pipe for the work he did, and didn't supply any other such material himself, nor see anyone else do so. He stated that what he did could not have been done with 40 or 45 feet of such pipe shown as furnished by the McHenry Company on their list of materials, and that the actual measurement of pipe was 52 to 55 feet. He identified plaintiffs' Exhibit 83 as being a picture of himself carrying a presto-light torch and a piece of pipe into the house, and in explanation stated that this was the torch that was on the job when he got there, and that he took the torch home every evening to prevent theft and accidents, and the pipe " * * * could be a piece of galvanized pipe * *" although the only piece of such pipe he used was a piece of ¾″ for dressing out the lead. He further stated that if he used it, it was his own pipe. The only reasonable inference that can be drawn from Burgdorfer's and Eisele's uncontradicted testimony is that some other material was brought on the job at this house beyond that there when the men arrived. However, this does not mean that these other materials are thereby proven to have been Board property. Even the witness Williams, who testified that he saw Muckler and McLean, Board foremen, and another man deliver certain material which he itemized to the

house on McPherson, did not identify the material as that belonging to the Board. There was no evidence as to where this other material came from. Absent evidence that Board material was in fact used, the appellants have failed to sustain the burden of proof as to such issue.

This court finds that Board employees did work at the house belonging to respondent's son and daughter-in-law when they did have work to do upon public school buildings, and were caused and directed to do so by the respondent. The fact as found above that the employees did work at the house owned by respondent's son and daughter-in-law is the same as that found by the trial court, although the trial court made no finding as to whether or not the employees did then have work to do upon public school buildings or whether or not they were caused and directed to work on this house by the respondent. This part of the above finding has never been contested by respondent, except as to whether or not the employees were actually laid off during the time they worked at the house, and so might not be said to be employees. However, the record is clear that the men were, at the time they worked on the house, employees of the Board. Upon oral argument, counsel for respondent frankly admitted that this record shows that these men were not, in fact, on involuntary vacation due to layoffs when they were working on the house in question, and indeed, in view of the record, he could not seriously otherwise contend. The respondent testified upon deposition read into the evidence as an admission against interest that eight employees of the Board worked at the house, and identified them by name and trade. Moreover, he testified that he did not know when the layoffs were to occur, nor who was to be laid off, and made no attempt of any kind to find out when the layoff would occur, or who would be laid off, when he asked the various foremen to secure men to do work at this house.

Considering the second part of the finding, that there was work that should have been done upon the school buildings, this is evidenced by the fact that the jobs at which the records falsely showed these employees to be when they were in fact at this house were projects scheduled in advance as work to be done. Neither can the excuse be offered that there is no showing this work was not done by other employees, for it is obvious that those employees would have to be taken from jobs that had to be done. This is so, unless the building department is heavily overstaffed and job schedules formulated to create work rather than on the basis of getting necessary work done. This court is unwilling to place such an onus upon the Board, or that department thereof, upon this record. Evidently that is the subject of another action. See Antoine v. Fletcher, supra. The conclusion is that the work upon which these employees were supposed to be working was necessary to the proper maintenance of the school buildings and either did not get done, or was done by other employees taken from other necessary work which did not get done, at that time. For example, respondent's witness Eisele testified that he had some requisitions for work a month old, that he " * * * have to go back on, that aren't finished, * * *" and that he had these requisitions prior to May 12th. On May 26th and 27th he did the identical work as to ·school, job number, charge, and description of work that his false time sheet of May 12th through 15th showed him doing on May 13th and 14th, and on May 19th, 20th and 21st he did the same work as he was shown doing on May 14th and 16th, only he spent three days on it, instead of the two days he had originally scheduled. As other evidence that respondent's actions caused the work of the Board to be done secondarily to that on the house belonging to respondent's son and daughter-in-law, the exhibits show that the work Moegle did on May 19th and May 23rd was the identical work, and had the same school name, job number, charge, and description of work as that his false time sheet of May 12th through 15th showed him doing on May 12th and 13th. The same is true of the work Zollmann did on May 19th and 23rd. It was at the same school, and had the same job number, charge, and description of work as that his false time sheet showed him doing on May 12th and 13th.

In regard to the last portion of this finding, the admissions against interest made by the respondent upon the occasion of his deposition fully substantiate that the respondent caused and directed the employees to work at the house and in the work they did on the house. Respondent stated therein that when he first saw the Board foreman Muckler, he suggested to Muckler that Board employees be used; that when he and Muckler had a conference about the work with Burgdorfer, upon Burgdorfer's statement that he didn't have the men available, Muckler, in respondent's presence, said they would give him a couple of men. Respondent further testified that at about the same time he asked Muckler for men, he asked Manley to get him some carpenters and to get them for work on May 12th, that he gave keys to the house to Varone and to Grimes; that he told the carpenters, Zollmann and Moegle, to reopen a door that had been shut off, to tighten the woodwork and mortises where it was loose, to " * * * generally go around and job it up as they usually do and straighten it up, * * *" to put down vinyl tile in the kitchen after putting a subfloor down, to fix whatever was loose, to fix the basement stairway and to lay a new floor in the second floor bath; that he talked to Manley several times about work to be done on the house and asked him to secure plasterers and carpenters for the work, "Question Board employees? Answer Yes, sir, yes, sir;" that he asked Manley, "Do you have these men lined up? Will they be out there on May 12th"; that he told Manley " * * * to start them all together and let them all

work together, May 12th, Monday morning." Respondent's further testimony was that the plasterers plastered and recoated the kitchen ceiling and walls, patched and put a finish coat on the second floor bathroom, put a finish coat on living room ceiling, entrance hall and dining room as well as filled in some cracks in those rooms, finished an area about two or three feet square in the wall in the large room on the south side of the house on the third floor, fixed a bulge in the front hall, patched some plaster in the room in the northeast corner of the house and in the other bedrooms on the second floor wherever loose paper had pulled the plaster off, and that Varone installed some white tile in the kitchen, and that he instructed the plasterers as to what to do. Respondent testified that he talked to Board foreman Grimes about securing Eisele to do the plumbing work in the early part of May, about the same time as he talked to Manley and Muckler; that he asked Grimes to look at the house and tell him what was wrong with it and that Grimes did so one evening; that Grimes was with him when McHenry inspected the house and that he told Grimes what he wanted done with respect to the lavatory or toilet, the tub and fixtures, and to change the sink from the third floor and put it on the first floor. Costello testified he got some of his instructions from respondent personally, and the rest from his foreman Grimes. Respondent further testified that he gave Dougherty directions and instructions as to where to install certain electrical fixtures.

The court finds that Board employees were paid from public funds for the period they worked at the private residence on McPherson Avenue. Again, this is the finding of the trial court so far as it is above stated, and the respondent does not otherwise contend; relying instead upon the fact that these public funds were later replenished by having the men work for the Board for an equal time and not paying them for it, or by repayment of the money by personal check of the employees, and the finding of the trial court that the Board suffered no monetary loss. The effect of any such finding of a lack of monetary loss, assuming for that purpose its substantiation by the facts, will later be discussed, as will the question of whether or not this record does substantiate such a conclusion.

The witness Quinn, shops manager for the Board who was Meginnes' superior, gave testimony that when adjustments were to be made the procedure was "* * for the mechanic to show on a subsequent time sheet that he performed duties while in the service of the Board of Education and the procedure we must follow is to show he is not to be paid, due to an overpayment for the days he was inadvertently paid," and that this was the procedure followed in these instances. Quinn further testified that the first he knew of the necessity for any corrections was May 26th, although he did not know of the specific employees until May 29th; that when the Board was paying semi-monthly there was a time when the Board was as much as two weeks behind in the payment of the employees; that in November of 1957, the Board went to bi-weekly payments, cutting this lag down to five days; that under the payment procedures in effect by the Board at the time of trial in October, 1958, which were the same as those in effect in May, 1958, time was not being turned in three, four, or five days in advance, and the men were being paid promptly; that under the semi-monthly procedure in effect prior to November, 1957, he did not think it was necessary to turn in time sheets in advance except where a holiday intervened, but that his testimony on the point would be an assumption because his duties were not in function with the payroll. He stated that all the notations were in Meginnes' handwriting, so far as he could remember. In connection with the contention of respondent that these "adjustments" were customary and not unusual, Quinn refused to say, because his duties were not in handling the

time sheets, but he did know there had been adjustments made.

The testimony given by Meginnes, the payroll clerk, was that his main responsibility was to transfer the information shown on the weekly time sheets onto the composite sheet, that the employees would submit five working days at a time to the foreman on a time sheet showing the school at which the work was done, the job number, the date, the description of the work, and other incidental information. These sheets were turned in, in advance, to the foreman who brought them in personally, or mailed them in to the shops manager's office, and provide for the approval of each weekly sheet by the foreman of that particular man, but some foremen did this weekly and some at the end of the month, although the men were paid on a two-week basis; that the reason for the advance time sheet was to allow him time to process some 370 weekly time sheets in time to get this composite sheet to the downtown office; that he had never known of a situation like this before, involving four different crafts and four different foremen with errors of three, four or five days involving eight different men, during the same period, although he had had such situations before involving two or three. He testified he didn't know exactly when the time sheets for the men involved were turned in to him, but that in the normal course it would have been prior to May 16th, even as early as the 12th, which if the sheets were mailed would mean that they had been mailed earlier. The composite sheet for this period left his office for the downtown office on Tuesday, May 20th, at noon, and covered the pay period of May 5th through May 16th, for which the men were paid on May 20th or 23rd. Meginnes was informed by the various foremen of the inaccuracies, and made notations on the May 12th through 16th time sheets to indicate them, except as to Eisele, which he did not learn of until May 29th when he saw the notation in Quinn's handwriting attached to the time sheet. He did not remember exactly

when any foreman notified him, except that it was after noon of May 20th, because if it had been done sooner, he would have corrected the composite sheet before it left the office for the downtown office; that the foreman Greble told him there was a mistake on Moegle's and Zollmann's time sheets, that the foreman Muckler told him of the mistake on Williams' and Dougherty's time sheets, that foreman Freivogel told him about Kavanaugh's and Varone's, and that Grimes put a notation on Costello's time sheet for August 11-15, stating that Costello was not to be paid for August 11-12-13-14 to repay for the week of May 12-16. This was done sometime about the middle of August, and prior to that he had no knowledge Costello had not worked for the Board on May 12th through 16th. None of the foremen gave him an explanation for these errors and corrections. Meginnes further testified that the making of "adjustments" was not unusual in his experience as payroll clerk for the Board.

McBride testified he was the assistant auditor for the Board, and the payroll certifications were filed with his office, but that any adjustments made would not show on his records. He further testified that each man received pay checks for the following periods and in the amounts shown: Dougherty was paid $354.32 for May 5th through May 16th, or on the basis of 86 hours at the rate of $4.12 per hour for 8 hours per day for 10 days plus 6 hours overtime; Williams was paid $296.64 for May 5th through May 16th, on the basis of 72 hours for 8 hours per day for nine days out of the ten-day period, at a rate of $4.12 per hour. Moegle was paid $294 for May 5th through May 16th on a basis of 80 hours for 8 hours per day for 10 working days; the identical rate and hours was time of Zollmann; Eisele was paid $320 for the 10 day work period May 5th through May 16th, of 80 hours. Costello was paid $310 for the 80 hours work for the ten days in the pay period of May 5th through May 16th, and so was Varone. Kavanaugh was paid $266 for the ten days

in the pay period of May 5th through May 16th.

The uncontradicted evidence, then, is that public funds were paid out to these men for this work, and thus diverted from the public purposes, for which they were intended and accumulated, to a private purpose.

Again referring only to the uncontradicted evidence, how long were the public funds so diverted? Respondent admits Moegle and Zollmann worked at the house on May 12th, 13th, 20th, 21st, and 22nd. Their time sheets for the week of May 19th through 23rd shows they were not working on the 20th, 21st and 22nd, and that they were docked for the 8 hours they worked on May 19th for the Board to recover for the payment of May 12th, and docked for the 8 hours they worked for the Board on May 23rd to recover for the payment of May 13th. Quinn's testimony established that the employees would have been paid for the pay period including the week of May 19th through 23rd on June 6th. The public funds paid Moegle and Zollmann for a private purpose were therefore admittedly so diverted, from May 20th or 23rd until June 6th. Respondent admits that Varone and Kavanaugh worked at this house on May 12, 13, 14, 15 and 16. Their subsequent time sheets show that they were docked for work done for the Board on May 21, 22, 23, 26 and 27. The public funds paid Varone and Kavanaugh for a private purpose were admittedly so diverted from May 20th or 23rd until June 6th. Respondent admits that Eisele worked at the house on May 12, 13, 14 and 15. His time sheet for May 19th through 23rd discloses he was docked for work he did for the Board on the 19th, 20th, 21st and 22nd of May. The public funds paid Eisele for a private purpose were admittedly so diverted from May 20th or 23rd until June 6th. Respondent admits that Costello worked at the house on May 12, 13, 14 and 15 and his subsequent time sheet and the evidence of Meginnes establish that he was not docked until August 11, 12, 13 and 14. There is no testimony

as to when the payday for this pay period was, although from the testimony of Quinn and Meginnes as to the five-day lag, it can be inferred it was not before five days after the end of that pay period, which cannot be ascertained from this evidence. Respondent's check to Costello, Exhibit 68, was dated August 18th. Respondent's explanation of this length of time is that he intended to use Costello for some other work to be done later on, but that the whole affair " * * * broke up into quite a conflagration, and I just sort of delayed it." The public funds paid Costello for a private purpose were admittedly so diverted from May 20th or 23rd until the payday for the pay period covering August 11th through 15th, although that date cannot be ascertained by this record. Respondent admits that Dougherty worked at the house on May 12, 13, 14, 15 and 16. Dougherty's time sheet for May 19th through 23rd discloses that he was docked for these days. However, Quinn's and Meginnes' testimony was that the work shown on his admittedly incorrect time sheet for May 12th through 16th was a project to be paid for out of bond issue funds and the "adjustment" could not be made by docking his pay due for later work for the Board, and the testimony was that Dougherty paid back this money by his personal check, although there is no way to ascertain when this was done. There is no check to Dougherty from respondent in evidence. Not only were public funds admittedly paid to Dougherty for a private purpose, but a special kind of public funds, bond issue funds, were admittedly so diverted from May 20th or 23rd until a date which cannot be ascertained from this record. Respondent admits that Williams was working at the house on McPherson for four days, May 12, 13, 14 and 15. He was shown on his admittedly false time sheets for these days as working on the same project as Dougherty, and so, that work being a bond issue project, the wages for May 12, 13, 14 and 15 could not be recovered by docking later pay, and Exhibit 60, a receipt from the Board to Williams,

shows that he made repayment for the four days' wages on June 5, 1958. However, Williams' check from the Board for the period of May 5th through May 16th is in evidence. He never cashed it. His repayment of $131.84 as wages for the four days has enriched the bond issue fund by that amount. If he later cashes the checks in evidence, the regular funds of the Board, as contrasted with the bond issue funds, will then be depleted by $131.84, nor will there be any recovery therefor unless bond issue funds in that same amount can be transferred to the regular funds. The same would probably not be true if other checks are issued to him, less this amount of $131.84, but this record gives no basis for determining how the matter will be handled. So far as Williams is concerned, then, it cannot be ascertained from this record when public funds will be depleted, or what fund will be depleted. As the matter now stands, the public funds have been enriched by the payment of $131.84 by Williams to the bond issue funds, and the only loser is Williams, who, even when he cashes the check Burgdorfer gave him, Exhibit 59, will be out $3.20, the difference between what he was paid on the Burgdorfer figure at $4.02 per hour for 32 hours, and what his rate was given by McBride at $4.12 an hour for 32 hours.

The trial court further found in this connection that the Board suffered no monetary loss, and obviously, from its memorandum, placed heavy reliance thereon in finding no "gross misconduct" by respondent. The question of whether there was, or was not, any monetary loss must therefore be placed in proper perspective before proceeding. That question is important to a determination of whether or not this cause is now moot. The same question is even necessary to a determination of whether or not the court can grant that part of the relief prayed for by the appellants as to ordering the respondent to repay the Board all sums of money paid or transferred to the employees for services performed on the house in question because, of course, if there was no loss, there should be no repayment ordered. However, the question of monetary loss, if any, suffered by the Board, while it is an element, or item, to be considered along with the other factors disclosed by the evidence, is certainly not controlling or decisive to a determination of whether or not the court should have granted that part of the prayer calling for removal of respondent from office as a member and President of the Board because of "gross misconduct." Neither should it be given any greater weight than any other factor. There are several reasons this is so.

In the first place, there is no requirement to be found in Section 165.583, supra, nor can any statement in that section justify an inference that a monetary loss is necessarily connected with gross misconduct. That section contains several clauses, and each states an action the circuit court can require of the Board and/or of the members thereof. Thus, the court has power to require the Board and its officers: (1) to account for their official conduct in the management and disposition of the funds, property and business committed to their charge; (2) to order, decree and compel payment by them to the public school fund of all sums of money, and of the value of all property which may have been improperly retained by them, or transferred to others, or which may have been lost or wasted by any violation of their duties or abuse of their powers as such members or officers of such Board; (3) to suspend any member or officer from exercising his office, whensoever it shall appear that he has abused his trust or become disqualified; (4) to remove any such member or officer upon proof or conviction of gross misconduct or disqualification for his office; (5) to restrain and prevent any alienation of property of the public schools by said members or officers, in cases where it may be threatened, or there is good reason to apprehend that it is intended to be made in fraud of the rights and interests of the public schools. The court has all

these powers independently of each other. There is no requirement that before the action of removal as authorized by the fourth clause of that section can be ordered, there must be some finding that a loss or wasting of money, property, etc. such as would require restitution under the first, second, or fifth clause of the section must also be found.

■ There is another equally compelling reason the question of monetary loss is not necessarily related to whether the acts complained of constitute gross misconduct. To so rule would interpret the public trust of elected officials at least primarily, if not solely, in the light of the pecuniary results of that official's actions. The constitutents of any elected official are entitled to far more from that official than conduct which amounts to requiring him to act solely as a custodian of their funds. It is not difficult to bring to mind acts which even though they result in monetary gain to the public funds could amount to, in certain circumstances, gross misconduct. It is not the result of the actions complained of which the law looks to, in order to determine gross misconduct; it is to the actions themselves. To hold otherwise would compel the people to wait upon results before they sought to protest the actions taken. It would open the door to all sorts of evasive maneuvers and fictitious schemes to hide the monetary gain of the official. The lack of monetary loss, assuming for the moment there was a lack of it, must never be considered in the light of "excuse" or "justification." It can have no claim upon such an exalted status but, in its proper perspective, should be regarded as "restitution." So far as the wages that had been paid to the employees by the Board and were returned by those employees to the Board in the form of pay check adjustments in subsequent pay periods, upon receiving an equal sum from respondent or others for him, that is exactly what it was. It was an act of "making good," of "giving an equivalent for," of restoring something to its rightful owner.

See "restitution," Webster's New International Dictionary, 2nd Edition. Accordingly, the actions of respondent will be considered in the light of a determination as to whether or not they constituted, of themselves, "gross misconduct" as that term is used in the statute, sufficient that the court should have directed respondent's removal, and the question of whether or not the Board suffered any monetary loss must be viewed as merely one of the multiple factors bearing thereon. As such factor, it is heavily outweighed by the actions of respondent, as previously herein found.

■ Neither are we of the opinion that evidence elicited from the witness Meginnes that such conduct was not "unusual" and had taken place in the past is of any value whatsoever to respondent. It cannot aid respondent to prove, as respondent's counsel repeatedly sought to do, that other people had been equally guilty of such gross misconduct in the past. This court is not concerned with how the officials or employees of the Board *have acted* in the past, but rather with how those same officials and the respondent *should have acted* in the past, now, and in the future to avoid being removed from office for gross misconduct. The fact that others have been equally at fault in the past is a most curious argument to explain conduct alleged, and herein found, to constitute gross misconduct on the part of respondent.

■ Moreover, whether it consists of bond issue moneys, special levies, or other regularly collected tax moneys, a public fund is not to be regarded by those impressed with its control as a sort of bank, from which money can be diverted or withdrawn from time to time, subject only to its being replaced. The thunderous negative reply that would come from the very employees of the Board who, impliedly at least, approved of the respondent's actions, should some citizen from off the street having no connection with the Board request the loan of a considerable sum of money from public funds for several weeks

or for any time whatsoever is obvious. The same would be true of a citizen from off the street who requested the various foremen of the Board to take workmen away from work upon school buildings to work upon his house. Yet the duty of that same private citizen toward those public funds is very much less than that owed toward them by respondent, the duly elected member and President of the Board having such public funds and buildings in its care.

It is the decision of this court that the appellants have proved the respondent to have caused and directed employees of the Board to be taken away from work upon public school buildings to do work upon a house owned by his son and daughter-in-law, and to have caused and directed the payment of these employees from public funds. Such actions are so far out of keeping with the standards of conduct the public has a right to expect from their elected officials and evidences upon the part of the respondent such a lack of ethical responsibility and callous disregard for the obligations which he voluntarily assumed upon his election to the position of public trust which he occupied that this court is totally unable to characterize respondent's conduct as "indiscreet" but holds it to be such a flagrant violation of the trust reposed in, and the duty of, an elected official as to constitute "gross misconduct" as that term is used in Section 165.583, supra, requiring his removal from office. The trial court committed prejudicial error in not ordering respondent's removal from office.

Previous to this point, we have assumed that the trial court's ruling that there was no monetary loss to the Board was justified by the evidence, and have held herein that even with such an assumption favorable to the respondent, his conduct was such that the trial court should have ordered his removal from office. Whether or not this assumption, embodying as it did the finding of the trial, is correct in the light of this record will now be examined in order to determine whether or not that part of the petition should be granted praying the court to enter its decree:

"* * * ordering defendant to repay to the Board of Education of the City of St. Louis all sums of money *paid or transferred to the aforesaid employees for the services performed by them on said house* held by defendant's son and daughter-in-law; and for such other and further relief as the Court may deem meet and proper in the premises;" (Emphasis supplied.)

There is an obvious difference between ordering respondent to comply with that prayer and ordering him to repay all sums of money "* * * which may have been improperly retained * * * or transferred to others *or which may have been lost or wasted by any violation of their duties or abuse of their powers as such members or officers of such board * * *.*" See Section 165.583, supra. (Emphasis supplied.) However, as stated earlier herein, the petition invokes the broad equitable powers of the court, and we hold those powers sufficient to compel an inquiry into the question of the Board's loss and a basis for ordering any money found to have been lost or wasted to be repaid to the Board by respondent.

It will be recalled that, of the Board employees whom respondent admits worked at this house, only three, Williams, Eisele, and Costello, testified. Why the various foremen or the other men were not called is unexplained. In any event, Costello's testimony is that his foreman, Grimes, told him what to do out at the house. While he stated that he understood what to do about tearing up the floor from talking to Grimes on the telephone, he also stated that when he and Grimes were out at the house, Grimes directed him as to what to do, that "All the directions I got I got from my foreman," and that Grimes directed him as to the work he did on the fourth day he was out there. There is nowhere any testimony as to how long Grimes was at the house, although since Costello was

only there during regular working hours, the inference is clear that Grimes was at the house during those hours. Neither does this record disclose Grimes' rate of pay. Respondent testified that he gave Grimes one of the keys to the house, and the inference is clear that he was to oversee at least part of the work there. Respondent's testimony on deposition as to the foreman Muckler responding to his call, and coming out to look over the house and tell him what needed to be done, places Muckler at the house, although again the record is silent as to how long, or whether it was during hours he was, or should have been, working for the Board. There is no evidence as to Muckler's rate of pay.

Concerning the loss of such items as the time office personnel spent making these "adjustments", the evidence of the witnesses Meginnes, Quinn, and McBride indicates clearly that this was done on Board time. The rate of pay of these men, or how long it took to make these "adjustments" on the various records (time sheets, payrolls, etc.) is not shown.

The time sheets definitely establish that the employees who worked on this house later went back and did the very work on school buildings they were incorrectly shown doing while they were at the house. In at least one instance, in the case of Eisele, the work, when done, took longer than it was originally scheduled to take, so far as the record discloses. Moegle, Zollmann and McBride are all shown by the uncontradicted evidence to have done the work shown on their false time sheets after they had worked at the house. There is no showing as to whether it took more hours to do the work at this later date or not, except as to Eisele, or whether or not such additional time was made necessary by the delay in proceeding with the work while the work on the house was being done.

■ It follows that there was a monetary loss suffered by the Board as a result of respondent's gross misconduct, clearly established by the undisputed evidence. However, the amount of that loss cannot be ascertained from this record. Our duty, then, is to remand this cause for further proceedings, especially since it is obvious that the elements missing from the record upon the issue of how much loss the Board suffered can be easily supplied upon a retrial of this case. Daggs v. McDermott, 327 Mo. 73, 34 S.W.2d 46. This ruling makes it unnecessary to pass upon Williams' credibility and the weight, if any, to be given his testimony. As previously stated herein, that testimony is cumulative, except as to how much the loss suffered by the Board amounts to. Williams' testimony was that instead of the four days the respondent admitted that he was working at the house on McPherson, he went out to the house on April 24th or 25th, at the direction of his foreman, and worked there a total of fourteen days: five days in April, four days from May 5th through May 9th (he was off one day) and five days the week of May 12th through 16th. His further testimony put Dougherty, Varone, Kavanaugh, Eisele, and Costello working at the house prior to May 12th. Eisele and Costello stated that they did not so work, but made no statement as to whether or not the others did. McBride's testimony establishes payment to these men, from public funds, for periods prior to May 12th, and since respondent's position has always been that the men did not work there prior to that date, he has never contended that there was any repayment for any funds paid to the men for work done prior to May 12th. A finding that the men did, in fact, work at the house on McPherson Avenue prior to May 12th, while they were, in fact, employees of the Board, would therefore establish further monetary loss to the Board. To pass upon Williams' credibility now would necessarily affect the very issue upon which we are remanding this case, and it follows that this issue should be left for determination at whatever further proceedings are instituted.

In remanding this case for further proceedings to determine the amount of loss suffered by the Board, we are well aware of the expense and time-consuming nature of such retrial as compared to the small amount involved, but the amount of loss is relatively unimportant. So long as there is any loss to the public, that loss must be restored. The principle involved far outweighs the cost factor. Even as there are no degrees of dishonesty, neither are there any degrees as to the purpose of public funds. All of those funds belong to the public, and none, no matter how small the amount, is to be diverted from the purpose for which the people taxed themselves to provide them. We cannot and would not refuse to order this remand because there is little money involved, any more than we would order it because there was a lot of money involved.

[23, 24] The appellants' final contention is that the trial court committed prejudicial error in excluding from evidence the respondent's bank statement covering the period from May 16th through May 27th, 1958, and by the refusal of the trial court to allow certain admissions against interest, made by respondent, to be read into evidence. The bank statement and the admissions against interest of Dr. McCaffery, if admitted in evidence, would, according to the appellants' offer of proof, establish that Dr. McCaffery's bank balance on various dates was as follows: May 16, 1958, $7.27; May 15, 1958, $8.27; May 19, 1958, $22.27; May 20, no balance given; May 21, $8.20; May 22, $8.20; May 23, no balance given; May 26, $28.33, and also $7.53; May 28, $175.63; and the deposits by Dr. McCaffery were as follows: May 16, no deposit, May 15, $100.00; May 19, $110.00; May 20, no deposit; May 21, no deposit; May 22, $300.00; May 23, no deposit; Monday, May 26, $1,300.00." Appellants

contend the only justified inference that could be drawn from the evidence would be that Dr. McCaffery predated the checks when he issued them, as a subterfuge in an attempt to establish his intention prior to his discovery of the investigation leading to this action to make payment for the services performed for him by Board employees. Under our view of this case, it does not matter when respondent decided to pay this money to these men, or whether he always, as he contends, had that intention, or whether he had money in the bank to do so, or not, or when he paid the men. Regardless of all of those things, the men were still admittedly paid with public funds, and those funds were not recovered until the dates herein stated. We do not rule upon the point for that reason. Moreover, we do not ordinarily review the trial court's ruling on the admission or exclusion of evidence in a proceeding of this nature. Middelton v. Reece, Mo., 236 S.W. 2d 335.

This cause should be reversed as to the trial court's ruling that respondent should not be removed from office as a member and President of the Board because of his gross misconduct, and remanded for further proceedings not inconsistent with the rulings herein. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court.

The judgment is therefore reversed, and the cause remanded for further proceedings.

ANDERSON, Acting P. J., RUDDY, J. and SAM C. BLAIR, Special Judge, concur.